Blough *et al. v.* Parry *et al.*

pellant's demurrer to the answer or in sustaining appellee's demurrer to the reply.

Judgment affirmed.

Filed April 2, 1896.

No. 16,874.

BLOUGH ET AL. *v.* PARRY ET AL.

| | |
|---|---|
| 144 | 463 |
| 143 | 467 |
| 145 | 109 |
| 145 | 657 |
| 147 | 55 |
| 147 | 700 |
| 144 | 463 |
| 148 | 99 |
| 150 | 161 |
| 150 | 164 |
| 150 | 165 |
| 150 | 276 |
| 152 | 331 |
| 144 | 463 |
| 154 | 672 |
| 144 | 463 |
| 160 | 326 |
| 144 | 463 |
| 162 | 364 |
| 144 | 463 |
| 165 | 96 |
| 144 | 463 |
| 169 | 156 |

WITNESS.—*Impeachment by Statements Made Out of Court.*—The right to impeach a witness by statements made out of court lies only where such statements are contrary to the testimony of the witness in court relative to material matter in issue.

SAME.—*Impeachment.—Negative Answer.—Cross-Examination.*—If a party recall a witness ostensibly for the purpose of further cross-examining him, and puts a question not proper in cross-examination, but eliciting evidence in chief, for the purpose of proving such fact she was such party's witness, and upon giving a negative answer such party has no right to impeach the witness by statements made out of court, as the testimony of the witness, though not beneficial, is not prejudicial.

SAME.—*Testamentary Capacity.—Cross-Examination.*—Where a witness has testified to the testator's mental unsoundness and to testator's specific acts towards him, the witness may be cross-examined in explanation of such acts and treatment by the testator.

INSTRUCTIONS TO JURY.—*Will.—Undue Influence.—Instruction not Based on Evidence Given*—It is error for the court to instruct the jury as to undue influence in an action contesting the validity of a will, where there was no evidence as to undue influence, and where it does not appear from the record that the instruction was harmless and not misleading.

SAME.—*Testamentary Capacity.—Unsoundness of Mind.*—Instructions which inform the jury that if the testator was a person of unsound mind, even though such unsoundness was so slight that it did not impair his capacity to make an intelligent testamentary disposition of his property, the will was void, are erroneous and harmful.

SAME.—*Unsoundness of Mind.— Testamentary Capacity.*— An instruction as to unsoundness of mind, in an action testing the valid-

ity of a will, which charges that if the evidence shows that the testator did not possess mind enough to know the extent and value of his property, the persons who were the natural objects of his bounty and their deserts, and that he had not sufficient memory to retain all these facts long enough to have his will prepared and executed, then he was of unsound mind and the jury should find for plaintiff, is insufficient in not fixing the time of such mental unsoundness at the time of executing the will.

SAME.—*Sanity.—Presumption.—Will.*—In an action testing the validity of a will on the ground of mental unsoundness, an instruction offered to the effect that "every person is presumed to be of sound mind until the contrary is shown," is correct and should have been given; and an instruction "that the burden is on the plaintiffs to show by a fair preponderance, unsoundness of mind," does not cure the error, for the instruction as to burden of proof does not raise a presumption as to sanity in favor of the testator.

SAME.—*When Misleading.—Expert Testimony.—Hypothetical Question.*—An instruction that the value of expert testimony depends on the degree of harmony between the facts stated in the hypothetical questions and those established by the evidence, and upon the skill and capacity of the experts, is misleading where it does not refer to their conduct and actions on the stand, the materiality of the facts assumed, their partiality or impartiality, and other relevant circumstances.

WILLS.—*"Unsoundness of Mind," Meaning Of.—Statute Construed.—Instructions.*—The expression "of unsound mind," as used in the Indiana statute of wills, means such a degree of unsoundness of mind as incapacitates one from making a will according to the standard fixed by the adjudicated cases for testamentary capacity. (For instructions as to "unsoundness of mind," see opinion.)

EVIDENCE.—*Burden of Proof.—Will, Testamentary Capacity.*—Plaintiff in an action to set aside a will on the ground of the testamentary incapacity of the testator has the burden of proving such incapacity.

APPELLATE PROCEDURE.—*Rehearing.*—A question cannot first be presented on a petition for rehearing.

From the Elkhart Circuit Court.

*Drake & Merritt* and *A. Ellison,* for appellants.

*R. Lowry, J. E. McClaskey* and *J. W. Hanan,* for appellees.

McCABE, C. J.—The appellees brought suit in the

Blough *et al. v.* Parry *et al.*

Lagrange Circuit Court against the appellants to contest the will of one Noah Blough. Proper issues having been formed upon the complaint the venue of the cause was changed to the Elkhart Circuit Court, where a trial by jury resulted in a verdict and judgment in favor of the appellees, setting aside said will, over appellants' motion for a new trial. The only error assigned here is on the action of the circuit court in overruling appellants' motion for a new trial. The grounds of contest alleged in the complaint were unsoundness of mind of the testator and undue influence exerted over him by the appellants.

A great number of causes are assigned therefor in the motion for a new trial, some of which we will notice. One Emma Norris was called and testified as a witness on behalf of the appellants. The wife of the testator had been dead some years, and Miss Norris had been the sole housekeeper of the testator for several years since the death of his wife, up to and during the time when the will was made. She had testified to many acts, conversations and conduct of the testator during that time, and upon such facts had stated her opinion that the testator was of sound mind. She had also testified that during that time he was able to get into or out of a buggy alone and hitch up his horses, and that appellant, Valentine, was always kind and filial toward his father.

Some days after she had thus testified on behalf of appellants the appellees recalled her, as they claimed, for further cross-examination, whereupon they propounded to her the following question: * * "While you were working for Mr. Noah Blough, did not Valentine Blough come there one day and tell his father that he wanted him to go to Ellison's bank, that he had some important business to transact, * * and

was not his father at that time sick and in his bed, and   *   *   did not his father say to him: 'I am not well enough to go and don't want to go,' that Valentine said 'Pap, it is important business and you must go,' and did he not take him out of bed, put his clothes on and put him into the buggy and drive off with him, *   and did he not return with his father on the same day and help him out of the buggy at the gate, and did his father   *   not crawl in on his hands and knees to the house and lie down upon the floor and cry bitterly and state that Valentine had taken him up to Ellison's bank and had him sign some papers, that he didn't know what they were, but supposed it was a will?"

Over appellants' objection that the question was not proper cross-examination, the witness was permitted to answer that she knew nothing of such happening.

Appellees then propounded to her, to lay the foundation to impeach her, the following question:

"Did you not have a conversation with Charles Parry and William Blough, at Noah Blough's house, in the month of March, 1887, and did you not then and there state to them that some days before that Valentine Blough had come to his father's house, and his father was sick and in bed, and told him that he wanted him to go with him to Ellison's bank, that he had some important business to transact; that his father said he was not well enough to go and did not want to go, that Valentine said 'Pap, it is important business and you must go,' that Valentine got his father out of bed, put his clothes on for him, took him out of the house and put him in the buggy and drove off toward Lagrange; that later in the day Valentine came back with his father, helped him out of the buggy and drove off; that his father crept into the

house on his hands and knees and laid down on the floor and cried bitterly and said that Valentine had taken him up to Ellison's bank and caused him to execute some papers; that he did not know what they were, but supposed it was a will?"

Over appellants' objection that the question was not proper cross-examination, she not having been examined on that subject in chief, and that the question was not proper for the sole purpose of impeachment, the witness was allowed to answer that she had no recollection of ever talking with them at that time, or any other time.

The appellees then called said Charles Parry and William Blough and asked them if the witness, Emma Norris, had not made the statements attributed to her in the question at the time and place indicated therein, and they each answered that she had, over appellants' objection that the answers were not sufficient ground for impeaching the witness, and that it was not competent to prove undue influence by impeachment.

We think the court erred in permitting these questions to be answered.

The witness, Emma Norris, had, it is true, testified to many facts tending to establish the soundness of the testator's mind; but she had not testified to anything tending to negative the charge of undue influence in the procurement of the will, especially had she given no testimony on that branch of the case that was even inconsistent with her alleged statement to these two witnesses. One of the recognized methods of impeaching a witness is to prove that he has made statements out of court inconsistent with his evidence in court. It is not every statement made out of court by a witness that affords a ground of impeaching him. It is only such statements made out of court contrary

to the testimony of the witness in court, where such testimony relates to a material matter in issue. *Paxton* v. *Dye*, 26 Ind. 393; *Seller* v. *Jenkins*, 97 Ind. 430; *Horne* v. *Williams*, 12 Ind. 324; *Fogleman* v. *State*, 32 Ind. 145. But there must be contradiction between the statements alleged to have been made out of court and those made on the witness stand to afford a ground of impeachment by proving the statements made out of court. *Seller* v. *Jenkins, supra.* There was no such contradiction in this case. Therefore, there was no right to ask the question of the witness, Emma Norris, by the appellees for the mere purpose of laying the foundation for impeaching her. Conceding, without deciding that appellees did have the right to prove by her, or any other witness, the facts detailed in her alleged statement out of court to the two witnesses named at the proper time, because the other evidence discloses that on the day named in that statement the will was made in Ellison's bank in the town of Lagrange, and that the statement, if true, would tend to prove one of the grounds specified in the complaint for setting aside the will, namely, undue influence exerted over the testator by Valentine and other appellants; but when appellants asked Miss Norris whether those facts as detailed in the alleged statement occurred, and she answered in the negative, that was the end of their rights in that direction. For the purpose of proving the facts mentioned she was the appellees' witness. And though the statute authorizes a party in some instances to impeach his own witness, it has been held by this court, and, we think, correctly so, that such right only arises when the witness testifies to some matter prejudicial to the party calling him. Burns R. S. 1894, section 516 (R. S. 1881, section 508). In *Hull* v. *State, ex rel.*, 93 Ind. 128, at page 133, this court said: "Where a witness does not

testify to anything prejudicial to the party calling him, there can be no object in impeaching him, and hence the statute cannot apply to such case. Nor can it apply to a case where a witness fails to testify to such facts as he is called to prove. Such testimony, though not beneficial, is not prejudicial, and, therefore, no reason exists for impeaching the witness." The witness, Emma Norris, did not testify to the facts sought to be proven by her, and therefore no right arises to impeach her for her failure to testify to such facts.

This alleged impeaching testimony, under the circumstances, probably had a prejudicial influence on the jury. The evidence in support of the charge of unsoundness of mind was sharply conflicting, and as it comes to us we cannot say that it was of such a character that the jury must have based their verdict on the conclusion that the preponderance thereof was with the appellees on the charge of unsoundness of mind of the testator when he executed the will, and therefore we cannot say that they did not base their verdict on the charge in the complaint of undue influence exerted by the appellees. We have been unable to find any evidence in the record tending to support the charge of undue influence, aside from the alleged impeaching testimony already mentioned.

The court, of its own motion, gave seven long instructions on the subject of undue influence. One of them, the 10th, reads as follows: "10. The amount of undue influence which is sufficient to invalidate the will varies, of course, with the strength or weakness of the mind of the testator. The influence which would subdue and control a mind naturally weak, or one which had become impaired by age, disease, physical injury, family troubles and perplexity, or other causes, might have no effect to over-

come or mislead one naturally strong and unimpaired. The influence that will avoid or vitiate the will of a testator whose mind is thus weak and enfeebled need only be such as would, and did, cooperate with such weakness and feebleness of mind to the extent of supplanting the free agency of the testator and induce him to do that which he would not have done in the absence of such undue influence, by reason of his being unable to refuse what was thus desired of him, or too weak to resist the influence in question. Hence, if you believe, from the evidence in this case, that the mind of the testator, Noah Blough, at and before the time of the making of the will, had become thus weak and enfeebled, and that, by the degree of influence herein described, he was induced to make the will in controversy when he would not otherwise have made any will at all, or that he was induced thereby to make his will different from what he otherwise would have done, you should, in such case, find for the plaintiffs."

As before observed, there being no evidence of undue influence it was error to give the above instruction. It has been generally held by this court to be erroneous to give instructions to the jury not applicable to the case proven by the evidence. *Hill* v. *Newman*, 47 Ind. 187; *McMahon* v. *Flanders*, 64 Ind. 334; *Moore* v. *State*, 65 Ind. 382; *Nicklaus* v. *Burns*, 75 Ind. 93; *Summerlot* v. *Hamilton*, 121 Ind. 87.

There may be cases where such instructions may appear, from the record, to have been harmless. But it does not so appear in this case. In *Nicklaus* v. *Burns, supra,* this court said: "After the evidence has been heard and argument of counsel had, for the court to instruct the jury upon a state of facts not embraced in the evidence, nor discussed by counsel, is asking them to decide questions which have not been

submitted to them for trial. Jurors are liable enough to consider matters outside of the evidence, without being led off in that direction by instructions from the court. Such practice is well calculated to confuse and mislead the jury." And in *Hays* v. *Hynds*, 28 Ind. 531, at page 537, this court said: "Instructions should be pertinent to the case. Juries are apt to assume, and are justified in assuming, that they are applicable. This could only be so upon the ground that Alexander acting as a pork-dealer was doing business for the bank, and unless the jury utterly disregarded the instructions, it could scarcely fail to mislead them." To the same effect is *McMahon* v. *Flanders, supra.* Here the only evidence that tended to establish undue influence was the evidence erroneously admitted to impeach the witness, Miss Norris. The instruction above quoted was immediately followed up with six more long instructions touching the subject of undue influence. If ever there was a case where the instructions were calculated to impress the jury that there was legitimate evidence before them upon a given point, when in fact none had been introduced, this was such a case. It is difficult to see how the jury escaped being led by the instructions to conclude that the evidence of the alleged statement of Miss Norris was legitimate evidence of undue influence exerted by Valentine Blough on the testator to make the will contrary to his wishes. The admission of that evidence was reversible error regardless of the seven instructions on the subject of undue influence; and it was error to give the seven instructions on the subject of undue influence regardless of the question whether they were correct statements of law in the abstract, and regardless of the erroneous admission of the evidence mentioned.

But when these two errors are combined they con-

stitute more seriously prejudicial and controlling error. The prejudicial character of these two errors combined is intensified by the fact that the trial court nowhere in its instructions informed the jury that they could not consider the alleged impeaching evidence to prove the exercise of undue influence over the testator. The seven instructions on that subject implied that they could.

Moreover, the appellants requested the court, at the proper time, to instruct the jury that they could not consider that evidence for that purpose, but the court, as the bill of exceptions informs us, refused to give such instruction.

The 7th instruction, after alluding to the expert testimony of witnesses belonging to the medical profession in the case, says: "In weighing such testimony it will be proper for you to consider the degree of learning and skill possessed by such witnesses, their capacity to determine, as experts in that branch of knowledge, the probable or actual condition of the testator's mind from the facts submitted, and the degree of harmony there may be, or the opposite, between the facts stated in the hypothetical questions and those established by the evidence. In proportion to the degree of such harmony between the facts embraced in the hypothetical questions and those established by the evidence, and the skill and capacity of these experts, judging by the law of mind, to deduce therefrom just conclusions, will be the value and force of such testimony, and in view of all the facts presented to you by the evidence on those points, you will consider and determine what weight and effect you should give to such testimony. If you believe from such evidence, when considered in connection with all the other proofs in the case, that during the period of time in which the will of the testator was executed

he was of unsound mind, then it will be your duty in like manner to find for the plaintiffs."

The latter part of this instruction relating to unsoundness of mind we will consider in connection with the next, the 8th instruction.

But the forepart of the 7th instruction was calculated to mislead the jury. It laid down too narrow and too inflexible a rule for estimating the weight to be given to the testimony of an expert, and limited too closely the various matters which the jury were entitled to consider in weighing such testimony. It gave too much prominence to the mere skill of the expert, leaving out of view his credibility, as exhibited by his conduct and bearing on the witness stand, and invaded the province of the jury in attempting to set too narrow limits to their exclusive province of judging of the value and force of such testimony. *Cuneo* v. *Bessoni*, 63 Ind. 524; *Eggers* v. *Eggers*, 57 Ind. 461; *Durham* v. *Smith*, 120 Ind. 463, at page 468.

The 8th instruction is as follows:

"It is not necessary, in order to avoid the will in question in this suit, that the mental unsoundness of Noah Blough, the testator, if it is shown to have existed, should have actually entered into or affected the will or caused its execution. It will be sufficient to avoid the will if the evidence shows to your satisfaction that at the time it was executed, the testator, Noah Blough, was a person of unsound mind, as the laws of this State do not permit a person of unsound mind to execute a will."

The latter part of the 7th instruction, the 2d, 12th and the 13th instructions declare the same proposition of law as that embodied in the 8th, above quoted; and they all and each of them state the proposition as unqualified as the 8th does, that is, that a person of unsound mind cannot make a valid will.

These instructions, by numerous repetitions of the proposition, in effect told the jury that if the testator was a person of unsound mind, even though such unsoundness was so slight that it did not impair his capacity to make an intelligent testamentary disposition of his property, or, in other words, that though the unsoundness was so slight that it had no influence or effect either in the production of the will or in the disposition of property therein provided for, the will would nevertheless be void. Notwithstanding the statute provides that "all persons, except infants and persons of unsound mind may make a will," it has been the construction uniformly given thereto by this court for a long time that, "In legal contemplation, one who has sufficient mind to know and understand the business in which he is engaged, who has sufficient capacity to enable him to know and understand the extent of his estate, the persons who would naturally be supposed to be the objects of his bounty, and who could keep these in his mind long enough to, and could, form a rational judgment in relation to them, is a person of sound mind. If he has not mental capacity to this extent, he would not be a person of sufficient disposing mind." *Lowder* v. *Lowder*, 58 Ind. 538. In *Durham* v. *Smith*, *supra*, the following instruction came in question: "6. Furthermore, I instruct you that a person who is of unsound mind is incapable of making a valid will, and if there is unsoundness of mind, it is not necessary for the contestant to show that such unsoundness had anything to do with the manner of disposing of the property. In such a case the will is invalid, whether it is shown that the unsoundness of mind had, or had not, affected the character of the testament." This court said: "By adding the words 'in such a case the will is invalid, whether it is shown that the unsoundness had or had

not affected the character of the testament,' it changed the scope and meaning of the instruction, and was, in effect, telling the jury that, upon considering all the evidence, if they came to the conclusion there was any unsoundness of mind, or defect of any character in the mind of the testatrix, no difference to what extent such defect affected or impaired the mind, or whether it in any way affected the disposition of the property devised or the making of the will, the will would be invalid; and this, too, even though the evidence might affirmatively establish the fact that such defect in no way entered into the making of the will or disposition of the property, and that she had at the time sufficient mental capacity to make a valid will. In short, this charge recognizes but two conditions of the human mind, one sound and capable of doing all acts, and the other unsound and incapable of doing any act; that a person is responsible for all his acts, or not responsible for any of his acts. This is an erroneous theory of the law. *Trumbull* v. *Gibbons*, 51 Am. Dec. 253; *Clark* v. *Fisher*, 19 Am. Dec. 402; *Jackson* v. *King*, 15 Am. Dec. 354, and note 363.  * * * It is evident that a person might be possessed of the requisite capacity to make a will, as held in *Lowder* v. *Lowder, supra,* and yet have some defect of the mind, some delusion in relation to some subject entirely foreign to the execution of the will, the disposition of the property, the devisees, or those who are the natural objects of his bounty. It is not necessary that we point out in this opinion what particular defects or delusions there may be in a testator's mind, and yet he possess sufficient mental capacity to make a valid will; it is sufficient if there may be any to render the instruction under consideration erroneous.  * * *  We think

the instruction clearly erroneous, and ought not to have been given."

In *Burkhart* v. *Gladdish*, 123 Ind. 337 (343), Coffey, J., speaking for the court, said: "It is not to be denied that a person may be possessed of delusions and yet be capable of making a valid will." This court, in that case, overruled, and we think correctly. *Eggers* v. *Eggers, supra,* in effect on the point in question.

In the recent case of *Wallis* v. *Luhring*, 134 Ind. 447, at pages 449 and 450, this court said: "The court very properly avoided confusing the minds of the jury on this point, and instead detailed very fully the various forms of disease, all included under the terms 'unsoundness of mind.' * * * Names are not of so much consequence as things, and it was more important that the jury should understand the character and degree of mental infirmity which would incapacitate a person from making a will, than to know whether the disease should be called insanity, unsoundness of mind, imbecility, or by some other name."

It is, however, not denied by appellees' learned counsel that the 8th instruction standing alone would be error. But they contend that under the authority of *Durham* v. *Smith, supra,* and *Burkhart* v. *Gladdish, supra,* the instruction is so modified and explained by two accompanying instructions as to make it harmless, if not technically correct. Those instructions are numbered 2 and 3. No. 2 reads thus: "Under the laws of this State, a person of unsound mind cannot make a will, and a person of unsound mind means an idiot, *non compos,* lunatic, monomaniac, or distracted person."

This explanation is no clearer or plainer than the instruction that it is to explain or modify. *Non compos* is defined by Webster as a person of unsound

mind. That is one of the definitions of the word. But if there is any explanation or modification of the 8th instruction in the 2d it is all taken away by the 3d, which reads as follows: "The evidence given on behalf of the plaintiffs tends to show that the testator, at the time of making the will in question, was feeble in body and mind; that he was subject to delusions, and that his memory and reasoning powers were impaired, and that he was of unsound mind. In order that you should find for the plaintiffs, it is not necessary for the evidence to show that the testator was a maniac or madman, or crazy, as that word is popularly used, nor that he was a fit subject for a lunatic asylum; but if the evidence shows that he did not possess mind enough to know the extent and value of his property, the number and names of the persons who were the natural objects of his bounty, their deserts with reference to their conduct generally, and treatment of him, their capacity and necessity; or that he did not have sufficient memory to retain all these facts long enough to have his will prepared and executed, then he was of unsound mind, and you will find for the plaintiffs."

Had this instruction told the jury that if the testator had and was possessed of the measure and degree of mental capacity therein described when he made the will, he was of sound mind, there would be some ground for the contention that the 8th instruction was modified or explained thereby so as to render it harmless, if not technically correct. But it did not do so. On the contrary, it simply told the jury that if he did not have and possess that measure and degree of mental capacity he was of unsound mind. That in no way modifies or explains the statement that if he was of unsound mind when the will was made it is void. That is in no way inconsistent with or a modi-

fication of the idea couched in the 8th instruction, that if the testator was of unsound mind when the will was made, however slight or small the degree, the will was void. It only differed from the 8th instruction in that it told the jury that in the absence of a certain degree or measure of mental capacity the testator would be of unsound mind. Had it told the jury that if the testator had that degree of mental capacity when he made the will, then he was of sound mind, a very different question would be presented. There would then have been some ground for the contention that the 3d instruction explained what was meant in the 8th instruction by the phrase "unsound mind." The 2d and 3d instructions did not explain or modify the 8th and other instructions, announcing the same legal proposition, or cure the error therein. We, therefore, hold that it was error to give each one of said instructions.

The 3d instruction asked by the appellants and refused by the court was erroneously refused. It reads thus: "Every person is presumed to be of sound mind until the contrary is shown." This instruction correctly stated the law and ought to have been given. *Greenley* v. *State*, 60 Ind. 141; *Guetig* v. *State*, 66 Ind. 94.

Appellees' learned counsel concede that the instruction ought to have been given, and that its refusal was probably an oversight on the part of the court. They, however, contend that the error was cured by an instruction "that the burden is on the plaintiffs to show by a fair preponderance unsoundness of mind." They contend that the above statement embodies the idea that the law presumed sanity. That position cannot be maintained. In many civil cases the burden of proof rests upon the plaintiff. In such cases it is correct to instruct the jury that before the plaintiff can

recover he must prove his cause of action by a fair preponderance of the evidence. And yet, according to appellees' contention, that is tantamount to telling the jury, and that the court may tell the jury, that the presumption is in favor of the defendant, that the plaintiff has no cause of action against him. That is not the law. That a preponderance of the evidence must be adduced by the party having the burden of proof to justify a recovery by him does not mean that a presumption arises in favor of the adverse party that no cause of action exists. In such a case there is no presumption either way. The court erred in refusing the instruction, and the error was not cured by the instructions given. There are other errors in the instructions, but they are such as may not be committed on another trial, and, therefore, we will not extend this opinion by passing upon them.

The witness Pearson testified in chief on behalf of appellees to having lived with and worked for the testator for a period of about three years, commencing in 1879 and ending in 1883; that he had then gone west and remained in Wyoming for about three years, coming back in 1886; that during the fall and winter of 1886-7 he visited the testator's house frequently, and that testator could not recognize him or be made to understand that he ever had known the witness. The witness detailed many facts tending to show that the testator was a physical and mental wreck and was of unsound mind. On cross-examination, in answer to proper questions, the appellants offered to prove by the witness that the visits of the witness to the house of the testator at the time mentioned by him were ostensibly as a suitor for the hand of Miss Norris, the testator's housekeeper, and that testator was trying to guard Miss Norris against the addresses of the witness, and that the witness knew it; that during those

visits the witness for some time was trying to borrow money of Miss Norris, the old man knew it and was advising her against lending him the money, and that was the reason why the old man treated the witness as he did at his house, and the reason why he did not want him there, and the witness knew it, and that the witness did finally, during said visits, succeed in getting $500 of the girl under a promise of marriage, and has never paid it back.

The court sustained appellees' objection to these questions and the proposed proof.

In defense of this ruling appellees' learned counsel have only to say: "But to go into the merits or demerits of said Pearson's conduct toward said Emma Norris, we insist, was entirely outside of the issues in the case."

Evidently counsel treat the proposed cross-examination as an attempt to impeach the witness. But it is nothing of the kind. A witness may be impeached, as we have already seen above, by proving statements made out of court inconsistent with his evidence in court, but the point of contradiction must be material to the issue. And so, too, a witness may be impeached by proving his general moral character to be bad, but not by proving particular acts of good or bad conduct. *Long* v. *Morrison*, 14 Ind. 595; *Cunningham* v. *State, ex rel.*, 65 Ind. 377; *Meyncke* v. *State, ex rel.*, 68 Ind. 401; *Rawles* v. *State, ex rel.*, 56 Ind. 433; *Bessette* v. *State*, 101 Ind. 85; *Spencer* v. *Robbins*, 106 Ind. 580. But a wider latitude is permissible in cross-examination merely. In *Wachstetter* v. *State*, 99 Ind. 290, at page 296, it was said: "In other words, counsel imply, if they do not assert, that there is no proper or legal connection between a man's reputation for truth and veracity and his reputation for integrity or honesty; that, while he may have the reputation of being a

thief and a highwayman, his reputation for truth and veracity may still be good.   *   *   Truth or veracity is a trait of the man of integrity or honesty; it is never a trait of the thief or robber.   *   *   *   *   When Stap and Wilson had testified that the reputation of Lee for truth and veracity was good, it was competent to show, upon cross-examination, that Lee had been repeatedly under arrest or in the station house on a charge of felony."

In *Bessette* v. *State, ex rel., supra,* this court said: "It is proper within the bounds of propriety, to be controlled by the trial court, that the character and antecedents of a witness may be subjected to a test on cross-examination, and that questions which go to exhibit his motives and interest as a witness, as well as those tending to show his character and antecedents, should be allowed."   In *Spencer* v. *Robbins, supra,* it was said:   "The rule is well settled that specific acts of immorality cannot be proved for the purpose of impeaching the moral character of a witness. It may be proper, however, under extraordinary circumstances, to ask questions of a witness on cross-examination for the purpose of showing his character and antecedents. *Bessette* v. *State, ex rel., supra; City of South Bend* v. *Hardy,* 98 Ind. 577 (49 Am. Rep. 792). This is a matter, however, within the sound discretion of the *nisi prius* court, to be exercised in each case as necessity may seem to require.   In order to justify a reversal there must have been a clear abuse." In *City of South Bend* v. *Hardy, supra,* this court said: "If the cross-examination tends merely to disgrace the witness, but relates to a collateral and independent fact, and goes clearly to the credit of the witness, whether in such case he has the privilege to decline or not, the matter so far rests in the discretion of the

trial court that in the absence of the claim of priv-
ilege, if the question relate to a matter of recent date
and would materially assist the jury or the court in
forming an opinion as to his credibility, the court will
usually require an answer, over the objection of coun-
sel, but may sustain an objection." So far as these
questions went to explain the reason why the testator
acted and treated the witness as he did it was proper
cross-examination, and it was reversible error to sus-
tain the objection; but as to such questions as related
to his previous character and antecedents the result
of our decisions is that this matter rested in the sound
discretion of the trial court, and unless we can say
that there was a clear abuse of that discretion the rul-
ing is not reversible error. We are unable to say that
the court abused its discretion as respects those
questions.

We are of opinion that the circuit court erred in
overruling the motion for a new trial. The judgment
is reversed and the cause remanded, with directions
to sustain the appellants' motion for a new trial.

Filed March 19, 1895.

### On Petition for Rehearing.

McCabe, J.—The earnestness, ingenuity and learn-
ing with which the petition for rehearing in this case
is pressed, and the growing importance of the subject,
have induced us most carefully to review the volumi-
nous record of over 1,000 printed pages, and also to
consider and investigate very closely the legal princi-
ples by which courts should be guided in determining
questions of testamentary capacity as affected by
mental unsoundness.

In opposing our holding that the trial court erred
in giving a series of instructions on the subject of un-
due influence, regardless of their correctness as ab-

stract propositions of law, because there was no evidence on that subject, counsel do not deny the correctness of the holding in the abstract, nor that it was error in the trial court to so instruct, but put their reliance upon the proposition that such error was not available to appellants, because they asked the court to give five instructions on the same subject. It might be sufficient answer to this contention that no such defense of that action of the trial court was made in appellees' original briefs on the hearing of this case, and no such question for decision was presented originally, and that the point is made now for the first time.

There was nothing said in the original briefs or argument about appellants being precluded or estopped by inviting the error in asking instructions on the same subject. It is too late to raise a point or present a question for the first time on a petition for a rehearing. But there is no merit in the point any way, because it does not appear from the record that appellants are the parties that invited the error.

The authority cited in support of the point is Elliott App. Proced., section 625-630. It is said in the latter section that: "The rule that a party cannot successfully assail a decision given upon his express or implied invitation is really nothing more than an application of the general principle that parties will be held to the theories they present and upon which they secure action by the court."

The rule as stated in *Pence* v. *Waugh*, 135 Ind. 143, at page 150, is: "'If a party opens the door for the admission of incompetent evidence he is in no plight to complain that his adversary followed through the door thus opened.'" *Perkins* v. *Hayward*, 124 Ind. 445. The rule as stated in *Louisville, etc., R. W. Co.* v. *Miller*, 141

Ind. 533, at page 563, is "that a party cannot successfully complain of error he invites."

The record does not show that appellants were the parties that invited and led the court into an erroneous line of conduct. On the contrary, it appears that the court acted on appellees' invitation into error, and did not act on appellants'.

Another point urged upon our consideration which we deem worthy of notice, is the holding in the original opinion that the forepart of the 7th instruction given by the court was erroneous, is seriously complained of because it is not pointed out in the opinion that there is anything analogous in the instructions passed on in the cases cited, to that contained in the one in hand.

It ought to be sufficient to say in response to this criticism that the language of the opinion is taken largely from one of those cases. One sentence in that instruction ought to condemn it if there was no other objection to it, relating as it does to the weight of expert testimony; that sentence reads thus: "In proportion to the degree of such harmony between the facts embraced in the hypothetical questions and those embraced by the evidence, and the skill and capacity of these experts judging by the law of mind, to deduce therefrom just conclusions, will be the value and force of such testimony."

It does seem that one who is so good a master of English as the learned counsel of appellee need not to be told that the language quoted makes the value and force of the expert testimony depend entirely upon the degree of harmony between the facts embraced in the hypothetical questions and those established by the evidence.

There is no other part of that instruction that qualified it in this respect.

That is, if there was perfect harmony between the

facts assumed in the hypothetical questions and those proven by the evidence, then the instruction, if it meant anything, meant such expert testimony was at least of great value and force regardless of the conduct and actions of such witnesses on the stand, the materiality of the facts assumed, the partiality or impartiality of such witnesses, and many other circumstances that the jury had a right to, and which it was their duty to take into consideration in weighing the testimony of such witnesses. It is true that if the facts assumed in the hypothetical questions are not substantially proven by the other evidence, the expert testimony thus elicited will be of little or no value. But it does not follow, on the other hand, that such expert testimony is entitled to full credence and belief or deemed of great value simply because the facts assumed in the hypothetical questions to the expert witnesses were fully proven by the other evidence. But such was the force and effect of the instruction. In *Goodwin* v. *State*, 96 Ind. 550, at page 569, it was held upon this subject that: "It is proper for the court to direct the minds of the jury to the facts of the case, but it is not proper for it to annex weight and value to them; that is the exclusive province of the jury." To the same effect is *Garfield* v. *State*, 74 Ind. 60.

The credibility of expert witnesses and the weight of their testimony are as much subject to the scrutiny and determination of the jury as that of any other class of witnesses that may come before them.

But the most serious objection urged against our original opinion relates to our holding on the instructions touching unsoundness of mind.

Counsel quote portions of the instructions other than the 8th, quoted by us in the original opinion, and repeating the same proposition contained in the 8th in different language, namely, as in the 7th, and which

we here reproduce from their brief thus: "If you be-
lieve from such evidence, when considered in connec-
tion with all the other proofs in the case, that during
the period of time in which the will of the testator
was executed he was of unsound mind, then it will be
your duty, in like manner, to find for the plaintiffs;"
as in the 2d, "Under the law of this State, a person of
unsound mind cannot make a will, and a person of
unsound mind means an idiot, *non compos*, lunatic,
monomaniac or distracted person," as in the 12th, "If
you are satisfied by a preponderance of the evidence
that when he executed the will the testator was of un-
sound mind you should find for the plaintiffs," and as
in the 13th, "you are to say whether or not the tes-
tator was of sound mind at the time of the execution
of the will. If he were not of sound mind you will, of
course, find for the plaintiffs."

The learned counsel say that our version of these
instructions that they "in effect told the jury that if
the testator was a person of unsound mind, even
though such unsoundness was so slight that it had no
influence or effect in the production of the will, or in
the disposition of property therein provided for, the
will would nevertheless be void," is, as they say, a
startling interpretation.

No reason is given or argument made why a direc-
tion to the jury that "If he [testator] was not of sound
mind you will, of course, find for the plaintiffs," does
not mean that they are to so find regardless of the de-
gree of mental incapacity and regardless of the fact
that such unsoundness did not deprive him of testa-
mentary capacity, or enter into or affect the will or
the manner of the disposition of the property therein
made. Or why a direction to the jury that if at the
time the testator executed the will "he was of un-
sound mind, then it will be your duty in like manner

to find for the plaintiffs," does not require them to so find, even though the evidence clearly showed that the unsoundness of mind was of such a character as did not deprive him of testamentary capacity according to the legal standard.

Nor is any reason or argument suggested, nor do we know of any, why the direction in the 8th instruction that: "It will be sufficient to avoid the will * * if * at the time it was executed the testator * * was a person of unsound mind" did not authorize and require the jury to set aside the will on account of such unsoundness, even though its degree did not destroy testamentary capacity or exert any influence on the testator as to the manner of disposing of the property or enter into the execution of the will.

These instructions were unqualified, and the full operation, force and effect of their language could not be cut down and limited by anybody but the court.

If the court had explained in these instructions, as was done in *Lowder* v. *Lowder*, 58 Ind. 538, and many other cases in this court like it, what was the legal signification of the phrase of unsound mind, then the instructions might have been correct. In the case last named the instruction, after stating that a person of unsound mind cannot make a will, proceeded to explain what was meant in contemplation of law by the phrase of unsound mind, stating that a lack of a certain degree of mental soundness or capacity was in contemplation of law unsoundness of mind. And on the other hand a certain degree of mental soundness or mental capacity was soundness of mind. The learned counsel for appellees finally come to the point and state their own interpretation of the instructions thus: "It is no doubt assumed in each of these instructions that, if the plaintiffs below had shown unsoundness of mind they would be entitled to recover, with-

out its being further shown that such unsoundness
had anything to do with the manner of disposing of
the property, or that it 'did,' in other words, affect the
character of the instrument. And this, we maintain,
has been hitherto the settled law of the State. That
the cases of *Willett* v. *Porter,* 42 Ind. 250, and *Eggers* v.
*Eggers,* 57 Ind. 461, have been, heretofore, either modi-
fied or overruled on that particular point we submit
with profound deference, is a misapprehension."

Our interpretation does not seem so startling to
counsel when they come to state their own interpreta-
tion of the instructions in question. The substance of
theirs is, that unsoundness of mind avoids the will
"without it being further shown that such unsound-
ness had anything to do with the manner of dispos-
ing of the property, or in any manner affected the
character of the testament.

That is precisely the interpretation placed on these
instructions in the original opinion, and which was so
startling to the learned counsel. But counsel are no
less mistaken in their assumption as to what the set-
tled law has hitherto been on the point under discus-
sion. That point was not in any manner involved nor
decided in *Willett* v. *Porter, supra,* as counsel mis-
takenly assert, and for that very conclusive reason that
case has never been modified or overruled on that par-
ticular point, as the learned counsel correctly assert.
But the other case, *Eggers* v. *Eggers, supra,* has been
modified before our original opinion.

It was held by this court in *Noble* v. *Enos,* 19 Ind. 72,
that all those excepted out of our statute of wills were
precluded from making wills, and that necessarily
precluded persons of unsound mind. It has, in effect,
been held by this court in a long line of cases that the
phrase of unsound mind, as used in our statute of
wills, means a person of such degree of unsoundness

of mind as incapacitates him from making a will according to the standard fixed by the adjudicated cases for testamentary capacity. *Runkle* v. *Gates*, 11 Ind. 95; *Rush* v. *Megee*, 36 Ind. 69 (73); *Lowder* v. *Lowder*, *supra;* *Turner* v. *Cook*, 36 Ind. 129 (137); *Moore* v. *Allen*, 5 Ind. 521; *Herbert* v. *Berrier*, 81 Ind. 1; *Todd* v. *Fenton*, 66 Ind. 25; *Burkhart* v. *Gladish*, 123 Ind. 337; *Bower* v. *Bower*, 142 Ind. 194; *Wallis* v. *Luhring*, 134 Ind. 447, and perhaps other cases. That standard as established by the foregoing cases is defined to be "one who has sufficient mind to know and understand the business in which he is engaged, who has sufficient mental capacity to enable him to know and understand the extent of his estate, the persons who would naturally be supposed to be the objects of his bounty, and who could keep these in his mind long enough to, and could, form a rational judgment in relation to them," has testamentary capacity. That has been substantially the standard for testamentary capacity from the days of Lord Coke down to the present time. See the cases last above cited. 25 Am. and Eng. Ency. of Law, 970-973, and authorities there cited; *Marquis of Winchester's case*, 6 Coke R. 23; 1 Redf. Wills, and authorities there cited.

The meaning thus assigned to the phrase of unsound mind by this court in construing our statute of wills was fully justified and founded in good reason. Because, according to Winslow, the phrase of unsound mind was first used by Lord Eldon to designate a state of mind not exactly idiotic, and not lunatic with delusions, but a condition of intellect between the two extremes, and unfitting the person for the government of himself and affairs. Taylor Med. Jur. by Clarke Bell, 678. To the same effect is *Den* v. *Johnson*, 2 Southard (N. J.) 455, s. c. 8 Am. Dec. 610.

Thus we find the phrase of unsound mind had at-

tained an appropriate and technical meaning in the law, conveying the idea of testamentary capacity according to the legal standard for such capacity.

Another statute in force at the time prescribing the rule for construing statutes provides that: "Words and phrases shall be taken in their plain, ordinary or usual sense. But technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import." R. S. 1894, section 240 (R. S. 1881, section 240).

To construe the statute so as to give the phrase of unsound mind its plain, or ordinary, or usual sense, as was done in the Eggers case, would bring its provisions into conflict. The word unsound controls the meaning of the whole phrase. And the plain, ordinary and usual sense of the word unsound, as defined by Webster, is: "Not sound; not whole; not solid; defective, infirm, diseased." The same meaning we have given the words as used in the wills statute was in effect given to them by this court in construing the criminal code of 1852, providing that if any person of sound mind shall do the things therein specified should be deemed guilty of murder in the first degree. *Stevens* v. *State*, 31 Ind. 485; *Herbert* v. *Berrier, supra.*

The statute of wills authorizes a contest on the simple "allegation of the unsoundness of mind of the testator." R. S. 1894, section 2766 (R. S. 1881, section 2596). *Lange* v. *Dammier*, 119 Ind. 567; *Etter* v. *Armstrong*, 46 Ind. 197. Now if the phrase "of unsound mind," as used in the statute and authorized by the same statute to be used in a complaint to contest a will for mental unsoundness means testamentary incapacity, as we have shown it does, what is the issue tendered by such a complaint? Unquestionably it must be testamentary incapacity, which incapacity is

charged in the complaint by virtue of the allegation of "unsoundness of mind."

To determine, therefore, whether the instructions in question were right we have only to determine on whom rests the burden of that issue. Appellants' counsel go into a lengthy discussion of that question, but it has been uniformly held by this court, in a long line of cases, that it rests on the plaintiff, and in most of the cases the reason upon which the rule is rested is that testamentary capacity is presumed. *Moore* v. *Allen, supra; Rush* v. *Megee, supra; Turner* v. *Cook, supra; Herbert* v. *Berrier, supra; Dyer* v. *Dyer,* 87 Ind. 13; *Hite* v. *Sims,* 94 Ind. 333; *Burkhart* v. *Gladish, supra; Wallace* v. *Luhring, supra; Pence* v. *Waugh, supra.* It is true outside of this State there is a conflict in the decisions upon this question, but the overwhelming weight of authority elsewhere is in accord with our decisions, this conflict having its origin in a rule of probate practice requiring the executor to offer some evidence of the testator's sanity on propounding the will, and to examine the subscribing witnesses on that point, whether his capacity was or was not impeached on that point. 25 Am. and Eng. Ency. of Law, 996-999, and authorities there cited. The meaning of the complaint charging unsoundness of mind being a charge of testamentary incapacity under the statute, and the burden of that charge being on the plaintiff, it follows, as an unavoidable conclusion that the plaintiff cannot stop short of proof of the testamentary incapacity he has alleged, and demand a verdict. The failure of the defendant to go forward and disprove the allegations of the complaint left unproven by the plaintiff cannot entitle the plaintiff to a verdict unless testamentary incapacity is presumed, and that, we have seen, is not presumed, but the direct contrary is presumed. But it may be asked

why we may not ascribe the same legal technical meaning to the phrase " of unsound mind" in the instructions in question as that in which the phrase is used in the statute and thus make the instructions correct. The reason is obvious. It is only the words used in a statute that are to be given their technical legal sense. Words used in instructions must be given their ordinary and usual meaning. Suppose the plaintiff proves that the testator was a monomaniac, that is, of unsound mind on a single subject, and that subject in no way connected with the will. May he recover, unless the defendant shall come forward and prove that it did not enter into the making of the will? - If so, the burden is cast upon the defendant without any cause, and the cases we have cited as to who has the burden are all wrong.

The burden can only be cast on the defendant where the plaintiff proves testamentary incapacity not of a transient character at some time prior to the time the will was executed. Under such circumstances all the authorities hold that the law presumes that such state of mind continues until the contrary is shown. *Sheets* v. *Bray*, 125 Ind. 33; *Physio-Med. Col. of Indiana* v. *Wilkinson*, 108 Ind. 314; *Raymond* v. *Wathen*, 142 Ind. 367; 1 Redf. Wills, p. 48, and authorities there cited. But that is so because the plaintiff has proven enough, which, taken with the presumption arising therefrom, are sufficient to establish his allegations of testamentary incapacity.

The rule as generally recognized is compactly and tersely stated by the Supreme Court of Alabama thus: "Charges 5, 12, 14 and 15 given  *  *  *  to the effect  *  *  *  that testamentary incapacity is an incapacity existing contemporaneously with the execution of the  *  *  will; that the burden of proof as to such incapacity is upon the contestants, the original pre-

sumption of sanity and capacity being always indulged, and this burden can only be discharged or shifted by showing prior habitual insanity, or actual insanity, or   *   *   incapacity at the date of the instrument, are correct expositions of the law." *Eastis* v. *Montgomery*, 95 Ala. 486, s. c. 36 Am. St. Rep., at page 227. See also *Physio-Med. Col. of Indiana* v. *Wilkinson, supra; Sheets* v. *Bray, supra.*

The foregoing decision from which we have quoted is not contrary to our own case of *Harrison* v. *Bishop,* 131 Ind. 161, but rather is in line with it in so far as the facts in the two cases are parallel. In the latter case this court held that: "The adjudication of mental unsoundness in proceedings for the appointment of a guardian for a person, while it conclusively establishes the fact of his inability to manage his estate, it does not necessarily establish the existence of such unsoundness as would incapacitate him from making a valid will. It is, however, *prima facie* evidence of such want of mental power, and   *   *   *   the burden is upon those who seek to uphold it to show by   *   *   *   *   evidence that at the time it was executed the maker had the requisite degree of mental capacity."

That holding is that such adjudication conclusively establishes his inability to manage his estate, but does not necessarily establish testamentary incapacity, yet that it was *prima facie* evidence of such incapacity and threw the burden on those upholding the will. That is exactly what was held in the Alabama case. The burden there was discharged, or shifted, on showing incapacity prior to the date of the will. In our case of *Harrison* v. *Bishop, supra,* the will was executed while the testator was under guardianship under a decree of the court for unsoundness of mind. Such unsoundness as shown by that decree was prior,

and the holding is that it is *prima facie* evidence of testamentary incapacity prior to the execution of the will. *Prima facie* evidence means, says Webster, "evidence which is sufficient to establish the fact unless rebutted." That puts the case exactly in line with the Alabama case. Both of these cases are in harmony with the uniform current of authority everywhere. 1 Redf. Wills, 48, 113 and 114, and authorities there cited; Wharton & Stile Med. Jur. sections 62 and 63, and authorities there cited; 25 Am. and Eng. Ency. of Law, 978-979, and authorities there cited. The case of *Kentworthy* v. *Williams,* 5 Ind. 375, is overruled in so far as it conflicts with this decision as to the burden of proof. The dictum in seeming conflict with this opinion in *Durham* v. *Smith,* 120 Ind. 463, in the lower half of page 465, is disapproved.

Counsel now for the first time urge that instructions 5 and 17, given by the court, if construed along with the faulty instructions above, would have so qualified them as to make the whole correct or cure any error in them. It is too late to present a question for decision for the first time in a petition for a rehearing.

No such question was presented on the original hearing and, therefore, cannot, under the well settled practice in this court, be considered or decided now. The other grounds urged relate to minor points in our original decision and consist only of a re-argument of the points then decided. The argument has not convinced us that our decision of any of them was wrong.

Petition overruled.

HOWARD, J., dissents.

Filed April 3, 1896.