DEERY ET AL. *v.* HALL ET AL.

[No. 13,832. Filed March 5, 1931. Rehearing denied May 26, 1931. Transfer denied May 18, 1933.]

684

Harry E. Yockey and Herbert E. Wilson, for appellants.

Joseph R. Williams, Chalmers Schlosser, Zoe M. Wyatt and James J. Moran, for appellees.

BRIDWELL, J.—This action was brought by the appellees, who were first and second cousins and heirs at law of one Oria Dolan, deceased, to contest the will of, the said Dolan and set aside the probate thereof. As grounds for the contest the complaint alleges that the said Oria Dolan, at the time said pretended will was attempted to be executed, was of unsound mind; that said pretended will was unduly executed; that it was executed under duress and that it was obtained by fraud. Appellants (the executor of the will and the beneficiaries therein named) filed answer to the complaint in general denial. Trial by jury, with a verdict as follows: "We, the jury, find for the plaintiffs, and find that this instrument of writing probated as the last will and testament of Oria Dolan, deceased, is invalid, and not his last will and testament and said will and

the probate thereof should be set aside." Motion for new trial was filed and overruled and judgment rendered on the verdict.

Appellees contend that no question attempted to be presented in appellant's brief is properly presented by their brief or record, and, therefore, can not be considered, but we hold that the brief shows a good faith effort, and from it, we are able to understand the real questions involved. The case will therefore be considered on its merits.

The overruling of appellant's motion for a new trial is assigned for error. Reasons for a new trial set out in the motion are that the verdict of the jury is contrary to law; that the verdict of the jury is not sustained by sufficient evidence; error in the admission and in the rejection of offered testimony and error in the giving of certain instructions and the refusal to give certain others.

Appellants contend that there is no evidence in the record, either direct or circumstantial, that the testator at the time he executed the will in controversy was a person of unsound mind; and no evidence proving or tending to prove undue execution of the will, or that it was executed under duress or obtained by fraud.

In determining the question as to the sufficiency of the evidence this court can not weigh the evidence, but if there is evidence to support the verdict, the judgment rendered on the verdict must stand. *Keys* v. *McDowell* (1913), 54 Ind. App. 263, 100 N. E. 385; *Cleveland, etc., R. R. Co.* v. *Gossett, Admx.* (1909), 172 Ind. 525, 87 N. E. 723; *McArtor* v. *State ex rel. Lewis* (1925), 196 Ind. 460, 148 N. E. 477.

We have given careful consideration to the evidence in order to determine its probative force; each of the witnesses testified to facts that had come under the personal observation of the witness during the period

of time of his acquaintanceship with the deceased testator, and no witness disputes the truth of any statement of fact made by any other witness while testifying.

The evidence in this case shows without conflict the following facts: The testator was about fifty-three years of age at the time of his death. The cause of death was acute lobar pneumonia with chronic interstitial nephritis as a contributory cause. He had lived in the city of Indianapolis for more than twenty years prior to his death. In his youth and early manhood he engaged in various occupations such as peddling fruits, working in a rolling mill, working as a bartender, and, in later years, worked in a poolroom and restaurant. He was a baseball player for many years, and a man of strong physique during that period of time. He, as a partner of others, was engaged in the saloon business for a time, and afterwards in running a soft drink establishment, where sandwiches and cigars were also sold and a poolroom run in connection therewith. At times he also operated a gambling room. He drank intoxicating liquors periodically for thirty years, or longer, and would often become drunk, and would become sick as a result of his excessive use of liquors; after his indulgences he would then refrain from the use of liquor for many months, and for periods of time as long as a year or year and a half. He was a periodical drinker. When he was a small child his father died; his mother died in the year 1923 and his brother in 1915; he was never married and, at the time of testator's death his heirs at law consisted of first and second cousins, aunts and uncles, none of whom had kept in touch with him, visited him or been on any terms of intimacy with him, for many years.

He became a member of the Catholic Church in 1915 and continued as such until his death. He often made gifts to the Little Sisters of the Poor, who called upon

him at his place of business. He had charge and control of his own business affairs until his death; made his own investments and accumulated and saved an estate of the approximate value of $33,000.00. He died on the 15th day of October, 1926, while an inmate of St. Vincent's Hospital, where he had been taken under the advice of his physician, a few days before his death. The will in controversy was made the day before he died, and the day preceding its execution he informed one of his friends that he wanted to make a will and requested of him that he get Judge Deery and bring him to the hospital. This was done and deceased on this occasion asked said attorney several questions concerning wills, inquiring as to when a will took effect, as to whether it could be changed, when once made, at any time before death. The attorney explained to decedent that the will must be in writing, that he must have two witnesses to witness his signature to the will, and they talked concerning the purposes of a will, the manner of execution and questions were asked by decedent and explanations given. No will was written at this time, but decedent asked the attorney to come back the next day. On the following morning he again sent for Judge Deery and the will was written. At the time it was being prepared no one was in the room other than the deceased, his attorney, and Father Gavisk, the pastor of St. Johns Church. Decedent told his attorney what disposition he wanted to make of his property, and the will was written in longhand in accordance with the directions given. It was then read to decedent, who stated: "That is all right, that is just the way I want it." The two subscribing witnesses to the will were Dennis J. Bush and L. N. Scheiner, and the will was signed by the testator and attested by the witnesses in conformity with the laws relative to the execution of wills.

Item 1 of the will directed that all just debts of decedent, the expenses of his last illness, funeral expenses, and costs of administration be paid out of the estate. Item 2 made the following bequests: To St. Vincent's Hospital, Indianapolis, $1,000.00; to St. Elizabeth's Home, Indianapolis, $1,000; to Little Sisters of Poor, Indianapolis, $1,000.00; to Catholic Community Center, Indianapolis, $100.00; to the Pastor of St. Johns Church, or his successor, as such, of Indianapolis, $3,000.00. Item 3 bequeathed all the rest and residue of the estate to the Right Reverend Joseph Chartrand, Bishop of Indianapolis, and his successors, in trust, to be used by him, as such trustee, for religious and charitable purposes as his discretion may dictate from time to time in the Roman Catholic Diocese of Indianapolis. Item 4 appointed James E. Deery, the scrivener who drew the will, as executor of the same. The will was signed by the decedent under the name of Ora Dooley, by which he was commonly known, and the greater number of witnesses testifying never knew him by any other name.

One witness, Jessie M. Kinney, a cousin of testator, called by the appellees, testified that in her opinion the decedent was of unsound mind. She based this opinion on facts detailed to the jury occurring from childhood until March, 1921. She testified that she and decedent attended school together at Redkey, Indiana, but while they (witness and decedent) were still children the Dooley family moved to Indianapolis, and, that she next saw decedent after "he was a man," and while she was living in Muncie, where decedent would visit the family while peddling fruit in that city, sometimes staying for weeks at a time; that he worked in a rolling mill at Muncie for a while, living with her mother's family, and would get drunk and go to bed and her mother would give him home remedies, and take care of him,

putting hot cloths on his head and giving him hot black coffee and things to make him "throw up"; that sometimes he would not be able to go to work; that this was in 1891 or 1892 and Dooley then went back to Indianapolis; that after his return to Indianapolis he was charged with robbing a woman of her money, arrested and put in jail; that he wrote to her and she came to Indianapolis, hired a lawyer, paying him ten dollars, acted as a book agent in the neighborhood and got witnesses, and when this case was over she went to work in a restaurant in said city; that she would see Dooley frequently and he would come to the restaurant every evening to see if she "got a tip" and would take it; that she would give him money and he would take it from her if she didn't; that during this time he drank liquor, and was drunk lots of evenings when he came down to the place where she worked; that she bought him a suit of clothes costing $15.00; that he would strike her if she refused him money; that Dooley was in Chicago in 1893, during the World's Fair, and she received a letter from his sister inviting her "up there"; that she went to Chicago and while there saw Dooley every night; that he continued his drinking and would become drunk; that he would meet her every evening and at one time when he walked up to her room with her he locked her in the room and kept her locked in for three days, and during that time did not feed her or bring her a drink, and that he would come into the room at different times during the day violent and ugly and drunk, and the only way she kept him from coming close to her was by running back of the bed which stood in an alcove, when she would hear him coming, where she could have jumped out of the window if he had come at her, and that he knew she would do so; that he took all the money she had at that time and she had him arrested for taking money from her, but did not press the

charge, but ran away; that she returned to Muncie and he followed her; that she didn't have any difficulty with him at Muncie, but told him that she had done all she possibly could for him, and was through, and for him to go his way and she would go her's; that at one time before going to Chicago he told her he had a bad disease and she let him have $2.00; that after that he told her he had syphilis; that he never paid back any money she let him have; that she lived in Muncie after returning from Chicago and continued to live there until in January, 1921, when she came to Indianapolis; that she saw decedent at her mother's home once in a while when he would be in Muncie; that it had been about two years since she had seen him before coming to Indianapolis in 1921; that she saw him twice in that year the last time in March, 1921, and this was the last time she ever saw the decedent.

Appellees called Albert E. Sterne, a physician and surgeon, and an instructor on nervous and mental diseases in the Medical School of Indiana University, as an expert witness. He testified that he was familiar with the effects of alcohol upon the system. That its continued use "affects the brain cells, changing the make-up of the mechanical nerve cells of the body itself so that the ability of the body to perform its normal functions is impaired"; that "the brain cells degenerate gradually and the whole body is impaired, the strength and particularly the intellectual faculties and the judgment and reasoning power"; that the excessive use of alcohol "is the sole factor or main factor in chronic nephritis; that "there is such a thing as dementia that comes from excessive use of alcohol. These are two types especially. In the acute type you get an acute brain cell swelling due to acidity and due to what we call toxic, that is, poison that gets in the blood stream and affects the blood stream. These are types dependent upon the in-

tensity of the infections that bring on these tremors, which runs all the way from the common drunk up to delirium tremens and to the complete stupor, dead drunk. It depends on the degree of poison. If it goes on sufficiently to stupefy the brain cell life then you begin to get stupefication all the way up to coma. These are the types of acute infection. If that sort of thing is kept up, kept up often enough, repeated and repeated, then the vitality of the brain cells becomes affected along with the blood vessels and they lose their ability to perform correctly and you begin to get a lowering of intellect and judgment and reasoning all of the higher faculties. That may go on to a complete alcoholic dementia. I mean by that the individual has practically no reasoning ability. If the degree of impairment is comparatively slight it affects his character, conduct and behavior only to a comparative degree and it may pass away temporarily but the individual is more susceptible, becomes much more amenable to the influence of others and he goes on in that way maybe through a series of years and to the casual observer might not show much change in conduct in a general sort of way. I think it is possible for a man to be afflicted with some sort of dementia and not be discovered only by medical science and yet at the same time transact small lines of business and the condition not be discovered by those that come in contact with him in the conduct of such small lines of business;" that he has treated hundreds of patients for alcoholism, and that each individual is a law to himself, some men being able to take a great deal with apparently little effect and in others the same amount of liquor would have a different effect; that there are all kinds and grades and all sorts of reaction.

Acute lobar pneumonia is given as the cause of death, with chronic interstitial nephritis as the contributory

cause in the "medical certificate of death" which was admitted in evidence without objection.

Dr. Sterne was asked the following question: "What effect does lobar pneumonia have, if any, upon the patient so far as his mental powers are concerned within say twenty-four hours of his death, if it progresses and he dies within twenty-four hours?" He answered: "Well it *usually* (our italic) has a profound effect in an acute case because the toxic in pneumonia will throw poison into the system and in addition to that it lowers the nutrition of the brain cells because the brain cells do not get sufficient supply of oxygen and in many cases there is an involvement of the blood vessels and brain cell swelling—an increase in the acid so you get a brain cell swelling, which renders the brain incapable of performing its functions, to be specific—the higher faculties, the intellect, reason and judgment and so forth." In answering a hypothetical question propounded by counsel for appellees the witness, basing his opinion upon the facts embodied in the question, said that said person as therein described was of unsound mind. The question assumed as true facts not established by any evidence in the cause stated in the briefs of the parties to this appeal, or found in the record. In the case of *Blough et al.* v. *Parry et al.* (1895), 144 Ind. 463, at page 485, 40 N. E. 70, 43 N. E. 560, 561, the court says: "It is true that if the facts assumed in the hypothetical question are not substantially proven by the other evidence, the expert testimony thus elicited will be of little or no value." In Page on Wills, 2nd Edition, Vol. 1, Section 697, the author says: "If the evidence fails to establish all the facts set forth in the hypothetical question, the opinion based on such facts is worthless, for the facts which the jury rejects may be the controlling facts on the question of sanity."

Jessie M. Kinney is the only witness who had known the deceased testator during his lifetime that expressed the opinion that he was of unsound mind. She had not seen him for five and one-half years prior to his death. This evidence is too remote to have any probative force in establishing as a fact that testator was of unsound mind on October 14th, 1926, the date of the execution of his will. Unsoundness of mind in order to render a will invalid must exist at the time of its execution. More than twenty witnesses who had known the decedent for periods of time ranging from five to forty years, and all of whom had come in contact with him with more or less frequency after March, 1921, until the time of his death, testified that he was of sound mind.

There is an entire absence of any evidence even tending to show that he at any time had any delusions or hallucinations; that he was overreached in any business transaction or exercised bad judgment in the making of any investments. There is much evidence of periodical drunkenness, but none that as a result thereof testator was ever afflicted with dementia, delirium tremens, or that there was any impairment of his mental powers.

It cannot be said that testator was of unsound mind because he died of acute lobar pneumonia with chronic interstitial nephritis as a contributing cause. The medical testimony is only as to the *usual* (our italics) result of such disease. The expert witness never had decedent under his observation and there is no testimony as to the effect of the disease in the instant case. The testimony of all witnesses, who saw and conversed with him while he was in the hospital, as well as that of the witnesses who were with him, observed him and talked with him on the day he was taken there and at times shortly prior thereto, and

at the time of the execution of said will, is that he was of sound mind.

"The question whether the testator's mind was affected by the disease must be determined, not alone by the nature and tendency of the disease, but by its effect in the particular case." *Blackhurst et al.* v. *James et al.* (1920), 293 Ill. 11, 127 N. E. 226, 232; *Teter et al.* v. *Spooner et al.* (1917), 279 Ill. 39, 116 N. E. 673.

The verdict returned by the jury is a general verdict. It cannot be determined from it whether the jury found the will to be invalid because of unsoundness of mind of the testator or from some one or more of the other causes stated in the complaint.

In the briefs of appellees no claim is made that the will was obtained by fraud and in such briefs it is expressly stated that that theory was abandoned at the trial.

There is no proof of any threats, or acts of coercion on the part of any person and there is an entire lack of evidence that the will was executed under duress.

On the issue of undue influence there was evidence of some circumstances proper to prove in attempting to make out such a case. It is proven that testator died in St. Vincent's Hospital and this hospital is a beneficiary under the will; that Father Gavisk, who at the time was pastor of St. John's Church, visited him at the hospital at different times during his last illness, and that the pastor of St. John's Church, or his successor, as such, is a beneficiary under the will; that at the time the will was being written no one was in the room where it was written but testator, Father Gavisk and James E. Deery, the scrivener who drew the will, and was named therein as executor. There is no evidence that any person, at any time, ever made any suggestion to the deceased concerning the disposition that should

be made of his estate. No evidence of any request, persuasion or attempt of any kind to influence the testator in the making of the will at the time of its execution or prior thereto. There is an entire absence of evidence that when testator executed the will in question he was under any coercive influence whatever.

Undue influence, in order to make a will void, must be directly connected with its execution and must operate at the time it is made. It must be of such compelling force that it expresses only the mastering desire of another and not that of the person who merely consents to affix his name to the instrument. *Goodbar* v. *Lidikey* (1893), 136 Ind. 1, 35 N. E. 691, 43 Am. St. Rep. 296; *Slayback* v. *Witt* (1898), 151 Ind. 376, 391, 50 N. E. 27; *Ditton* v. *Hart* (1911), 175 Ind. 585, 95 N. E. 119; *Wiley* v. *Gordan* (1914), 181 Ind. 252, 267, 104 N. E. 500; *Barr* v. *Sumner* (1915), 183 Ind. 402, 423, 107 N. E. 675, 109 N. E. 193.

We are of the opinion that the verdict of the jury in this case is not sustained by sufficient evidence, and that the court erred in overruling the motion for a new trial.

A verdict must stand upon evidence and not upon mere conjecture, however plausible. A mere possibility that a thing may be true will not sustain a legitimate inference that it is true. *The C. C. C. & St. L. R. Co.* v. *Miller* (1898), 149 Ind. 508, 49 N. E. 445; *Equitable Life Insur. Soc. of the United States* v. *Campbell* (1925), 85 Ind. App. 450, 150 N. E. 31, 151 N. E. 682.

Other questions as to the admission and rejection of evidence, the alleged misconduct of counsel, and as to the giving and refusal to give instructions are argued in the briefs, but since the judgment must be reversed for the reasons given, and as it is not likely that the

same questions will arise in another trial, we deem it unnecessary to discuss the same.

The verdict of the jury not being sustained by sufficient evidence, the judgment is reversed with instructions to the court below to grant a new trial.