MARY J. HUGGINS *et al.*

*v.*

MARY DRURY *et al.*

*Opinion filed October 24, 1901.*

1. WILLS—*burden of proof on bill to contest a will.* The contradictory testimony introduced by the contestants in a chancery proceeding to contest a will must not only be sufficient to overcome the effect of the affirmative testimony given in favor of the will by the attesting witnesses, but also to neutralize the presumption of law that all men are presumed sane until the contrary is proven.

2. SAME—*question arising for review, on appeal, where jury are instructed to find for proponents.* If the jury, in a proceeding in chancery to contest a will, are instructed to return a verdict for the defendants, the question for determination, on appeal, is whether the evidence given by the complainants, together with all justifiable inferences therefrom, was so insufficient, taken alone, as to require setting aside any verdict returned for the complainants.

3. SAME—*prejudice against relatives is not ordinarily ground for setting aside a will.* Unreasonable prejudice against relatives is not ground for setting aside a will, unless the testator's conduct can be explained upon no other ground than that of insane delusion.

4. SAME—*harsh treatment of son does not show presence of an insane delusion.* Acts of violence by a father to his son and statements derogatory to his son's character do not show the existence of an insane delusion, where there is nothing in such acts or statements which cannot be explained by the temper of the father and the acts and conduct of the son in provoking him.

APPEAL from the Circuit Court of Whiteside county; the Hon. W. H. GEST, Judge, presiding.

This is a bill in chancery, filed on March 20, 1900, by the appellants, Mary J. Huggins and Thomas W. Huggins, her husband, and William W. Drury, against the

appellees, Mary Drury, Lily A. Beeken, Ledon (or Lydon) R. Drury, Anna Grace Fassett, Walter C. Drury, Bessie May Dinneen, William Burton Drury, and J. Murray Eaton, executor of the last will and testament of Richard Drury, deceased, to set aside the will of the said Richard Drury upon the alleged ground that the testator was not of sound mind and memory when the will was made, "but, on the contrary, was in his dotage, and his mind and memory were so impaired, as to render him wholly incapable of making any just and proper distribution of his estate." Default was entered against Mary Drury; guardians *ad litem* were appointed for the minor defendants and answered; and answers were filed for the other adult defendants, except Mary Drury. On February 6, 1901, a trial was had, and the cause was submitted to a jury to determine whether the instrument in question was or was not the will of the deceased testator. Upon the trial, the appellees here, defendants below, being the proponents of the will, introduced in evidence the will, and the certificate of probate thereof, and the testimony of the three subscribing witnesses to the will. The proponents also introduced in evidence the testimony of twenty-seven other witnesses, besides the subscribing witnesses, in favor of the validity of the will, that is to say, of the soundness of the mind and memory of the testator. Thereupon, the contestants, being the complainants below and the appellants here, introduced twenty-six witnesses upon the subject of an alleged insane delusion, charged to have existed in the mind of the testator as to, and against, his oldest son, the appellant, William W. Drury.

After the introduction of the testimony, arguments were made to the jury by the proponents and the contestants, whereupon the presiding judge on his own motion instructed the jury as follows, to-wit:

"The court instructs the jury, that all the evidence, offered by contestants, has been stricken from their con-

192—34

sideration, and they are further instructed to find their verdict for the proponents of the will. The form of your verdict shall be: 'We, the jury, find that the writing, produced as the will of Richard Drury, deceased, is his will.'"

All the instructions of the contestants, or appellants, were refused. A verdict was found in accordance with the instructions of the court, and a decree was rendered, finding the instrument to be the last will and testament of Richard Drury, deceased, and taxing the costs against the appellants.

The facts are substantially as follows: The will of Richard Drury was executed on April 24, 1893. He died on April 28, 1899. The will was admitted to probate in the county court of Whiteside county. The deceased testator left an estate worth about $40,000.00, consisting of personal property valued at $5000.00, and real estate in Whiteside county, Illinois, and Lake county, Indiana, valued at $35,000.00. The deceased left him surviving his widow, the appellee, Mary Drury, and, as his only heirs, his daughter, the appellant, Mary J. Huggins; his son, the appellant, William W. Drury, and two grandchildren, to-wit, Myrtle A. Drury, and Ledon (or Lydon) R. Drury, only children of a deceased son, Robert I. Drury, who died before the death of the testator. Mary J. Huggins never had any children. William W. Drury was married to one Anna Grace Nicewonger, and was divorced from her in the State of Missouri on or about September 1, 1894, and, in October, 1894, was married in Missouri to his present wife. By his first wife, so divorced from him, William W. Drury had three children, —the appellee, Walter C. Drury, eighteen years old; Bessie May Drury, seventeen years old, and now the wife of Arthur Dinneen, and being the appellee, Bessie May Dinneen; and the appellee, William Burton Drury, born October 6, 1886. Since said divorce, the first wife of William W. Drury has married one Edward O. Fassett, and is the appellee, Anna Grace Fassett. Lily Drury,

the widow of the deceased son of the testator, Robert I. Drury, has since married a man named Beeken, and is the appellee, Lily A. Beeken. Letters testamentary were issued to the executor, J. Murray Eaton.

The testator was married the first time between 1850 and 1860, and the appellants, Mary J. Huggins and William W. Drury, and the deceased son, Robert I. Drury, were the children of said first wife, who died in 1866. Richard Drury lived as a widower on his homestead with his three children until February 24, 1875, when he married the appellee, Mary Drury. His daughter, Mary, was married on January 1, 1875, to the appellant, Thomas W. Huggins.

By the terms of his will the testator, *first*, gave to his widow the life use of all his personal estate; the life use of his homestead and the basement-barn and land therewith, being about four acres; one-third of the net rents, issues and profits of all his remaining real estate in Whiteside county during her life; also, the north one-half of ten acres of land in Lake county, Indiana, absolutely in her own right. The will provides that, upon the death or re-marriage of the widow, his personal property and said rents, issues and profits with the increase, if any, shall pass and become vested in seven equal shares; one share thereof in his son, William W. Drury; one share in his daughter, Mary J. Huggins, and the other five shares shall become vested in his said grandchildren, Lydon R., Myrtle A., Walter C. and William Burton Drury, and Bessie May Drury (now Dinneen), one share to each; *second*, the testator gave to his son, William W. Drury, in fee simple the south half of said ten acres in Lake county, Indiana, and two notes held by the testator against his son, William, both dated June 1, 1886, and due in one year's time, one for $1000.00, and the other for $924.55, each drawing interest at six per cent; the principal and interest, due on said notes at the date of the making of the will, being more than $2700.00, and, at the date of the death

of the testator, being about $3300.00; *third*, he gave to his grandson, Lydon R. Drury, the life use of about one hundred and thirty-one acres of land, and a timber tract of about six acres, expressing a desire that said Lydon should aid and support his mother, Lily Drury, so long as she remained the unmarried widow of Robert I. Drury, his deceased son; *fourth*, he gave to his granddaughter, Myrtle A. Drury, the life use of one tract of about sixty-one acres and of one-half of another tract of about seventy-seven acres; the life use of the other one-half of said seventy-seven acre tract to his daughter, Mary J. Huggins; *fifth*, he gave to his grandson, Walter C. Drury, the life use of forty acres, charged with the payment of one-half of the rents, issues and profits to his daughter, Mary J. Huggins, during her lifetime; *sixth*, he gave to his grandchildren, Walter C. Drury, Bessie May Drury (now Dinneen), and William Burton Drury, the life use of one hundred and twenty acres; *seventh*, he directed the cancellation and destruction of all notes and accounts, payable to him from the estate of his deceased son, Robert I. Drury.

CHARLES C. MCMAHON, JAMES E. MCPHERRAN, and MCCLAMONT & RAMSAY, for appellants:

In the contest of a will, if the evidence introduced by the contestants was such that it would, in the absence of any rebutting testimony on the part of the proponents, have justified a verdict against the will, it is error for the court to instruct the jury to return a verdict for the proponents. *Purdy* v. *Hall*, 134 Ill. 307; *Moyer* v. *Swygart*, 125 id. 267; *Collar* v. *Patterson*, 137 id. 407; *Keys* v. *Kimmel*, 57 N. E. Rep. 851.

It is not within the province of the court, on a motion to direct a verdict, to weigh the evidence and ascertain where the preponderance is. The function of the court is limited strictly to determining whether there is or is not evidence legally tending to prove the fact affirmed,

leaving out of view the effect of all modifying or coun-
tervailing evidence. *Frazer* v. *Howe*, 106 Ill. 563; *Smith* v.
*Gillett*, 50 id. 291.

In regard to the action of the court in taking the case
from the jury and directing a verdict against the con-
testants, the same rule must be applied that obtains in
respect to trials in suits at law. *Purdy* v. *Hall*, 134 Ill. 307.

Whenever a testator's mind is so deranged that he
makes his will under influence of an insane delusion the
will is void.  11 Am. & Eng. Ency. of Law, (old ed.) 154.

Delusions and hallucinations constitute that species
of mental unsoundness which is marked by persistent
and incorrigible beliefs that things which exist only in
the imagination of the patient are real. *People* v. *Hubert*,
63 Am. St. Rep. 72; 16 Am. & Eng. Ency. of Law, (2d ed.)
563; 9 id. 195.

L. T. STOCKING, for appellees:

When the evidence given at the trial, with all infer-
ences that could justifiably be drawn from it, is so insuf-
ficient to support a verdict for the plaintiff that such a
verdict, if returned, must be set aside, the court is not
bound to submit the case to the jury but may direct a
verdict for the defendant. *Phillips* v. *Dickerson*, 85 Ill. 11;
*Frazer* v. *Howe*, 106 id. 567; *Simmons* v. *Railroad Co.* 110 id.
340; *Bartelott* v. *Bank*, 119 id. 259.

On the contest of a will, as in this case, upon the ques-
tion of testamentary capacity, the law throws the burden
of proving the sanity of the testator, in the first instance,
on the proponents; but after a *prima facie* case has been
made out by the testimony of the subscribing witnesses,
the legal presumption is in favor of sanity, and the bur-
den of the whole case rests upon the contestants. *Wilbur*
v. *Wilbur*, 129 Ill. 392; *Carpenter* v. *Calvert*, 83 id. 62.

An insane delusion is defined "to consist of a belief
of facts which no rational person would have believed;"
"a belief in things as realities which exist only in the

imagination of the individual;" "a pertinacious adher-
ence to some delusive idea in opposition to evidence of
its falsity;" "a belief of some fact without any reasona-
ble evidence of its truth." *Schneider* v. *Manning*, 121 Ill.
376; Wharton & Stille on Medical Jur. (3d ed.) sec. 34.

A testator of sound mind has a right to leave his es-
tate to whom he pleases. *Freeman* v. *Easly*, 117 Ill. 213;
*Schneider* v. *Manning*, 121 id. 385.

Where the proof shows facts evincing sufficient capac-
ity in a testator to transact his ordinary business about
the time of making the will, the opinions of witnesses
as to a want of capacity are entitled to but little weight
on the question. *Brown* v. *Riggin*, 94 Ill. 568; *Carpenter* v.
*Calvert*, 83 id. 62.

A man's mind, his temper, his disposition and his feel-
ings may be in an improper state without impairing his
legal capacity to make a will. *Yoe* v. *McCord*, 74 Ill. 40.

A man may become prejudiced against some of his
children without proper foundation; and because he may
make unjust remarks against them,—remarks not war-
ranted by the facts,—it does not follow he had insane
delusions or that he is devoid of testamentary capacity.
*Schneider* v. *Manning*, 121 Ill. 383.

Mr. JUSTICE MAGRUDER delivered the opinion of the
court:

The only question presented by the record in this
case is, whether or not the court erred in withdrawing
from the consideration of the jury all the evidence of-
fered by the appellants here, the contestants below, and
instructing the jury to find a verdict for the appellees
here, the proponents of the will upon the trial below.

It is substantially conceded by the appellants in this
case, that the deceased testator, Richard Drury, was, at
the time of making his will, a man of sound mind and
memory, so far as his capacity to transact ordinary busi-
ness is concerned; but it is claimed, that he was laboring

under an insane delusion as to his son, the appellant, William W. Drury. Indeed, all the testimony taken on both sides, consisting of the evidence of fifty-six witnesses, shows that the testator was in the possession of testamentary capacity at the time of the making of his will, unless he was affected with an insane delusion as to his son, William. The only question of fact in the case, then, is as to the alleged existence and manifestation of such an insane delusion on the part of the testator.

In a contest to set aside a will, begun by the filing of a bill in chancery for that purpose, after the proponents of the will have put in evidence the testimony of the subscribing witnesses thereto, the competency of the tes-. tator to make the will, and the fact, that the same was signed and attested in the manner required by the statute, are *prima facie* established; and the burden of proof then rests upon the contestants, seeking to impeach the validity of the will. The contradictory testimony, introduced by the contestants, must not only be sufficient to overcome or neutralize the effect of the affirmative testimony, given in favor of the will by the attesting witnesses, but must also be sufficient to overcome or neutralize the presumption, arising from the general rule of law, that all men are presumed to be sane until the contrary is proven. In other words, "the law throws the weight of the legal presumption in favor of sanity into the scale in favor of the proponents." (*Purdy* v. *Hall*, 134 Ill. 298; *Graybeal* v. *Gardner*, 146 id. 337; *Bevelot* v. *Lestrade*, 153 id. 625; *Taylor* v. *Cox*, 153 id. 220; *Harp* v. *Parr*, 168 id. 459; *Johnson* v. *Johnson*, 187 id. 86). In the case at bar, a *prima facie* case was made in favor of the validity of the will by the introduction of the will itself, and of the certificate thereto, and of the testimony of the subscribing witnesses thereto.

The statute provides that, in case of a proceeding to contest a will by bill in chancery, the issue as to the validity of the will shall be tried by a jury. Therefore,

where, in a case contesting a will, the jury are instructed to find a verdict in favor of the proponents of the will, and against the contestants thereof, such action can only be justified by an application of the same rule, which obtains in respect to trials at law. Accordingly, in *Purdy* v. *Hall, supra*, we said (p. 303): "The rule in actions at law is, that, when the evidence, given at the trial with all the inferences that could justifiably be drawn from it, is so insufficient to support a verdict for the plaintiff, that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant. * * * It is manifest, then, that, if the evidence introduced by appellant was such that it would, in the absence of any rebutting testimony on the part of appellees, have justified a verdict in her favor, then the court erred in instructing the jury to return the verdict they did. And it is equally plain, that, if the reverse of this proposition be true, then there was no error in the action of the court."

The question, then, is whether the evidence, introduced by the present appellants, the contestants in this case, was such that it would, in the absence of any rebutting testimony on the part of appellees, have justified a verdict in favor of the appellants. Undoubtedly, cases may exist where a person may be able to transact some business, and yet be incapable of making a will on account of an insane delusion.

"Insane delusion consists in the belief of facts which no rational person would have believed. * * * Unreasonable prejudice against relatives is not ordinarily a ground for invalidating a will; but a will may be set aside where the testator's aversion is the result of an insane delusion, and his conduct cannot be explained on any other ground." (*Schneider* v. *Manning*, 121 Ill. 376; *Nicewander* v. *Nicewander*, 151 id. 156). Was the will of the testator, Richard Drury, the offspring of such an insane delusion that the claims of his son, William W. Drury, and

his daughter, Mary J. Huggins, to his favorable recollection at the moment of making the will, were "pretermitted?" (*Roe* v. *Taylor*, 45 Ill. 485). While it is contended that the conduct of the testator is such as to have indicated the existence of hostile feelings on his part towards his son, William, it is not claimed that his feelings were not kindly towards his daughter, Mary. On the contrary, the testimony, without contradiction, shows that he was very fond of his daughter, Mary. The alleged ground, upon which the alleged insane delusion in regard to the son is claimed to have influenced the making of the provisions of the will, which relate to the daughter, is that the daughter had no children, and the testator was afraid that what he left to his daughter might in some way go to his son, William. It cannot be contended that either the son, William, or the daughter, Mary, was disinherited under the influence of any delusion, because the will makes them devisees; and the injustice, said to have been done them, is merely the fact that the property devised to them was not of as much value as that devised to his grandchildren and his wife.

After a careful consideration of the testimony in the case, we do not think that the evidence of an alleged insane delusion in the mind of the testator, Richard Drury, given at the trial, with all the inferences that can justifiably be drawn from it, was sufficient to support a verdict for the contestants in this case.

There is testimony, tending to show that Richard Drury made statements derogatory to the character of his son, William, and was guilty on several occasions of violent conduct towards his son; but the evidence discloses the fact that he was a man of violent temper, and, while his statements and his conduct may have been manifestations of this temper, yet it cannot be said that they amount to what the law requires to constitute an insane delusion. The statements and conduct, attributed to him, do not indicate "a belief of facts which no rational per-

son would have believed," or "a belief in things as realities which exist only in the imagination of the individual," or "a pertinacious adherence to some delusive idea in opposition to plain evidence of its falsity," or "a belief of some fact without any reasonable evidence of its truth." (*Schneider* v. *Manning*, 121 Ill. 376; Wharton & Stille's Med. Jur.—3d ed.—sec. 34). "Where the testator's aversion is the result of a morbid delusion, and the testator's conduct cannot be explained on any other ground, the will will not be sustained." (11 Am. & Eng. Ency. of Law,—1st ed.—154).

There is nothing in the conduct of the testator, as disclosed by the evidence in this case, which cannot be explained by the temper of the father and the acts or conduct of the son. It is not necessary to resort to the theory of morbid delusion in order to explain any of the statements or acts of this testator. As we said in *Schneider* v. *Manning, supra:* "A man may become prejudiced against some of his children, and that, too, without proper foundation; and, because he may make unjust remarks against them,—remarks not warranted by the facts,—it does not follow that he has insane delusions, or that he is devoid of testamentary capacity. If such was the rule, but few wills would be able to stand the test where an unequal distribution of property has been made by a testator among children. A man has the right to dispose of his property by will in such manner as he may desire, and the fact, that he may give more to one child than another, does not affect the validity of a will, or prove that the testator is incompetent to make a will."

Many of the acts, which are spoken of by the witnesses as indicating the hostility of the testator towards his son, William, happened when he was between the ages of six and eighteen, and more than twenty years before the making of the will in 1893. The first act occurred, when William was six years of age, and upon an occasion when his father, the testator, was doing the "threshing"

upon his farm; the boy had brought some eggs, which the men, "threshing" in the field, made away with by throwing them at each other; this seemed to have made the testator angry, and he struck his son with a pitchfork he had in his hand. Two years after, one of the witnesses says that the testator "switched" his son, William; it appears that he had broken a window glass, and was punished therefor. Some five years thereafter, one of the witnesses states that, at one time, the testator threw a board or club at his son while "threshing" was going on, but did not hit him. One or two other occasions are mentioned when the testator, and his son, William, and his son-in-law, Huggins, were cleaning grain, or "threshing" grain, upon which the testator threw a shovel and a wagon-stick at his son, William. But it does not appear that the son was hit by either of the articles so thrown at him, and it did appear, that the boy had been guilty of running away, and of failing to do the work, assigned to him, in such a way as to suit his father. Other instances are mentioned of violent conduct on the part of the testator towards his son, which it is not necessary here to specify. They were merely acts of punishment, inflicted by a parent upon a son who did not act in accordance with the wishes or orders of the parent. They fall far short of establishing the charge of insane delusion.

It is also claimed that on several occasions the testator remarked that William was not his son. In *Petefish* v. *Becker*, 176 Ill. 448, we said (p. 454): "If the testator utterly without cause or reason, and without expressing distrust of the fidelity of his wife, doubted the paternity of his son, and from that cause alone disinherited him when he was one of the natural objects of his bounty, it might well be said that he did not then know who were the natural objects of his bounty; and if he was in such condition of mind that he did not know the actual objects of his bounty, and such condition caused him to make a will he would not have otherwise made, then he was not

of sound and disposing mind." We do not think that the remarks upon this subject, attributed by the witnesses to the testator, indicate any distrust on his part of the fidelity of his first wife, or any doubt as to the paternity of his son, William. William had proved to be a financial failure. The evidence tends to show, that his father had purchased a farm for him and given a note for the purchase money, and that William had sold the farm and gone to Kansas to live, and there had met with financial reverses. The evidence also shows, that William left his wife and children, and that he and his wife were divorced, and that his children came back to his father to be supported by the latter. The evidence also tends to show that the testator was fond of his son, Robert, and that Robert had gone to Kansas at the solicitation of his brother William, and had there died. His death was a source of much grief to the testator. In view of all these circumstances, the testator remarked, upon a number of occasions, that William was not his son, meaning thereby, as we construe the evidence, that his conduct was so opposed to the ideas of his father as to what his conduct ought to be, that he was not a son or boy of such a man as his father. The meaning of his expressions was that William's conduct was such that he was not worthy to be the testator's son, and not that the testator suspected in any way that his son was a bastard.

Without entering into any further discussion of the testimony, we are of the opinion that it does not tend to establish such an insane delusion in the mind of the testator in regard to his son, William, as that the jury would have been warranted in concluding that the will in this case was the product of such insane delusion.

Accordingly, we are of the opinion that the court below committed no error in instructing the jury to find for the proponents of the will.

The decree of the circuit court is affirmed.

*Decree affirmed.*