FREDRICK W. SCHMIDT

*v.*

GUSTAV A. SCHMIDT.

|201    191|
|212    ⁵606|

*Opinion filed February 18, 1903.*

1. WILLS—*fact that testator is infirm does not invalidate his will.* Old age and infirmity do not render a person incapable of making a will unless they have so far impaired his mind that he is incapable of understanding the business in which he is engaged at the time he makes the will.

2. SAME—*when opinions of witnesses are entitled to little weight.* Opinions of witnesses that a testator was forgetful and weak-minded are entitled to but little weight in the face of the positive testimony of many intimate business acquaintances that during the time such conditions were claimed to exist the testator was successfully pursuing his occupation, and was a sober, industrious and capable business man.

3. SAME—*prejudice against a child not ground for setting aside a will.* Prejudice of a testator against his child is not ground for setting aside a will unless it can be explained upon no other ground than that of an insane delusion.

4. SAME—*unequal division of property does not show insanity or undue influence.* An unequal division of the testator's property amongst his children does not, of itself, justify the court in holding that the testator was insane or that he was unduly influenced by the favored child.

5. SAME—*when verdict in will case will be set aside.* A verdict finding against the validity of a will will be set aside upon appeal and a new trial granted where it clearly appears the jury acted in utter disregard of the evidence.

6. PRACTICE—*when motion to strike cross-errors from the record will be denied.* If the expenses attendant upon a will case have been allowed and taxed as costs, an appeal brings up that part of the record, and a motion to strike from the files the cross-errors assigned upon the allowance of such expenses will be denied.

APPEAL from the Circuit Court of Cook county; the Hon. R. S. TUTHILL, Judge, presiding.

A. A. CANAVAN, and HARRIS S. KEELER, (GEORGE BURRY, of counsel,) for appellants.

JOHN C. TRAINOR, for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

This is a bill in chancery filed by Gustav A. Schmidt, against his brother, Fredrick W. Schmidt, individually and as executor and trustee, and Carolina Schmidt, his mother, to set aside the will of his deceased father, Friedrich Schmidt, for want of testamentary capacity in the testator at the time of the execution of the will, and on the ground that its execution was procured by Fredrick W. Schmidt and his mother through fraud and undue influence.    The bill having been amended, a joint and several answer was filed thereto by Fredrick W. and Carolina Schmidt, denying the allegations thereof, and a replication having been filed, an issue at law "whether or not the instrument set forth and described in the amended bill of complaint herein, dated the 7th day of February, A. D. 1899, and admitted to probate in the probate court of Cook county, Illinois, on the 23d day of February, A. D. 1900, as the last will and testament of Friedrich Schmidt, deceased, is the last will and testament of said Friedrich Schmidt, deceased," was submitted to a jury, and the jury returned the following verdict: "We, the jury, find the issues for the contestant, and we find that the writing propounded is not the last will and testament of Friedrich Schmidt, deceased." The jury also found specially, in response to interrogatories propounded to them, that Friedrich Schmidt was not mentally capable of attending to ordinary business on the day on which the will was executed or during the six months immediately preceding and immediately following that date, and the court, after overruling a motion for a new trial, entered a decree in accordance with the verdict finding that the instrument purporting to be the last will and testament of Friedrich Schmidt, deceased, was not his last will and testament, and decreed that the probate thereof be set aside and held to be null and void, and that all costs and charges of the suit, including $3000 for solicitors' fees, $310.15 stenographers' fees and $7 paid to the clerk of

the probate court, be paid by Fredrick W. Schmidt, as executor, out of the moneys belonging to the estate in his hands.  The said Friedrich Schmidt having died seized of real estate which was disposed of by the will, an appeal has been prosecuted by the defendants to this court, and they have assigned as error the action of the court in decreeing that the probate of the will of Friedrich Schmidt, deceased, be set aside and the will for naught held.  The appellee has assigned as cross-error the action of the court in decreeing that the executor pay the costs and charges of this suit, including solicitors' and stenographers' fees and the amount paid the clerk of the probate court for a transcript of the record of the proceedings of the probate of the will, out of the funds belonging to the estate, and the appellants have entered a motion in this court, which has been reserved to the hearing, to strike the cross-errors from the files.

Friedrich Schmidt, at the time of his death, resided at Riverdale, a suburb of Chicago, where he, with his family, consisting of his wife, Carolina, and his sons, Fredrick W. and Gustav, had resided for many years. On about February 1, 1899, Mr. Schmidt called upon Mr. Austin A. Canavan, an attorney in the city of Chicago, who had represented him for about fifteen years, with a view to make his will.  The matter was talked over between Mr. Schmidt and his attorney and the terms of the will were agreed upon, when he went home, with the understanding that the attorney was to prepare the will in accordance with the instructions given him, and he would return and execute the same within a few days. The will was prepared, and after providing for the payment of funeral expenses and debts, gave all the remainder of his estate to Fredrick W., his son, who was a practicing physician, in trust for the use of his wife, Carolina, during her life, and directed that upon her death, after paying all expenses incurred during her last illness, including her funeral expenses, the balance of

201—13

the estate should be divided between the two sons, one-fourth going to Gustav and three-fourths to Fredrick W., and designated Fredrick W. as executor without bond. On the 7th of the same month Mr. Schmidt again called at the office of Mr. Canavan and the will was read over by him to Mr. Schmidt, and being satisfactory, Horace A. Goodrich, who was engaged in the real estate and loan business, and who had known and transacted business with Mr. Schmidt for many years, and who occupied an office adjoining that of Mr. Canavan, was called in. Mr. Schmidt signed the will in their presence and they signed the same as attesting witnesses, and Mr. Schmidt carried the will away with him. The testator died on January 26, 1900, and the will was duly proven and admitted to probate in the probate court of Cook county, and Fredrick W. Schmidt qualified as executor.

At the time of his death the testator was about seventy years of age. For many years prior thereto he had been engaged in building, making loans, and had owned and sold more or less real estate. At about the time the will was executed he commenced the erection of a residence in Riverdale, the cost of which, when completed, was about $7800. In the latter part of January, 1899, he called upon Stephen V. Shipman, an architect who had been in business in Chicago for many years, whose business relations with Mr. Schmidt extended over a period of twenty-two years, and who had built a building for him on Larrabee street, one on Hoyne avenue and a store on West Twelfth street, in the city of Chicago, and arranged with him to prepare plans for the dwelling house which he was then about to erect, and to superintend its construction. Mr. Shipman testified he saw Mr. Schmidt frequently from that time until his death, and during the following spring and summer months almost daily; that Mr. Schmidt was constantly engaged in looking after his building, making contracts for materials and with workmen, as he had done upon buildings which he had previ-

ously erected for him.    Charles F. Rust, who was in the
lumber and milling business at West Pullman, testified
that he had known Mr. Schmidt for some seven or eight
years; that he sold him the mill-work for his Riverdale
residence during the summer of 1899; that "he was at
the mill frequently; he would drive over to the mill with
his horse and buggy; he had bids from other parties for
the mill-work on his house, and he would not buy until
he got a figure that suited him; that he wanted me to
furnish the mill-work, as he knew me, and was willing
to pay me $25 more than any one else by reason of that
fact, but said he would not go higher than that."    Wil-
liam Cleber, of Blue Island, testified he made a contract
with Mr. Schmidt in September after the will was exe-
cuted, to put in the plumbing in his new residence;
saw him frequently and talked with him about the work.
Asmus Claussen, of Dalton, who had been in the hard-
ware business for sixteen years, testified he knew Mr.
Schmidt well;  sold him hardware for the store build-
ing and for his new residence, and talked with him fre-
quently during the summer of 1899.    John H. Meyers, of
Riverdale, who had houses to rent and had known Mr.
Schmidt for eighteen years, testified he visited at his
house frequently, called upon him every day or two
during his last sickness, and read to him from the pa-
pers up to the day before his death.    Edward N. Stein,
of Blue Island, testified he had known Mr. Schmidt for
twenty-five years; had the contract for putting on the
slate, cornice and tin roofing on the new building in 1899,
and furnished part of the hardware; that "my work on
the building brought me in contact with him every day;
he was around the building, working sometimes a little
and looking after the work of everybody that was there."
Simon B. Schoon, a gardener of Riverdale, testified he
had known Mr. Schmidt thirty years; saw him very fre-
quently up to the time of his last sickness.    Frank R.
Baker, the railroad agent at Riverdale of the Pan Handle

road, testified he had known Mr. Schmidt for eighteen years; sold him railroad tickets and delivered freight to him, and saw him frequently during the summer of 1899; was on the school board with him six years; "his manners were quiet; had a good deal of determination; was self-reliant." Frank X. Rauwolf, of Blue Island, did the carpenter work on the new building in 1899; testified he saw Schmidt almost every day while the building was in course of construction; that "he personally made the contract for the work; he watched the work himself on the job; we discussed the way of doing the work." Michael H. Kelly, a merchant, the village clerk and a member of the school board of Riverdale, testified he served on the school board with Mr. Schmidt six years; he was a member of the school-board at the time of his death; attended the meetings regularly up till a short time, two to four months prior to his death. Charles F. Trapp, a liveryman in Riverdale, testified that for six years he rented the flat in which he lived, from Mr. Schmidt; paid him the rent each month up until his last sickness; saw and talked with him frequently. Dr. George W. Webster, a professor in the Northwestern medical school and president of the Illinois State Board of Health, testified he saw Mr. Schmidt twice shortly prior to his death; was called in consultation two months prior to his death and again a few days prior to his death. The first time he was called in consultation he found him in a normal mental condition; that he was of sound mind at that time.

The attesting witnesses, and all the other witnesses above referred to, expressed the opinion in the most positive terms that on the 7th day of February, 1899,—and many of them that up to a few days prior to his death,— Mr. Schmidt appeared perfectly natural and entirely rational, and that he, in their opinion, was as well qualified to make a will or do business on the 7th day of February, 1899, as he had ever been at any time in his life. The evidence shows him to have been a sober, industri-

ous and capable business man, and up to within two to four months prior to his death to all appearances physically well preserved for a man of his years. That he went to the city alone and had his will prepared, and afterwards executed it when no one was present but the attesting witnesses, and that he arranged to build an expensive dwelling house and carried it through to completion, made the most of the contracts for the materials and labor and exercised a watchful care over it while the work was in progress, advised frequently with the architect in regard to the materials to be used and the responsibility of the bidders, and with his attorney as to how he could best be protected from mechanics' liens, collected his rents and attended to his duties as a member of the school board up to within a few months of his death, is not denied but stands admitted upon this record. In view of this uncontradicted testimony, which seems absolutely trustworthy, we are unable to understand how it can be said that in the winter of 1899 the testator did not have sufficient mental capacity to make a will, and upon what possible hypothesis the jury could find that during the time he was constructing his building, collecting his rents and performing his official duties he was not mentally capable of doing ordinary business, and had not been for months.

The witnesses who were called by the contestant,—and they were a number,—stated that for a year or two prior to his death Mr. Schmidt appeared to be in failing health; that he seemed forgetful; that he would repeat the same story; that he appeared to be weak-minded; that he was worried and despondent; but when their testimony is analyzed it will be found that the only facts given to the jury upon which they based their opinions were, that Mr. Schmidt was in failing health; that he often repeated himself, and that he worried over the fact that his sons were not friendly, and claimed Gustav had mistreated him and his wife.

The evidence is uncontradicted that Mr. Schmidt was affected with chronic cystitis, or inflammation of the bladder, for some years prior to his death, and that the disease finally caused his death. The physicians called, five in number, with one exception agreed that except when the disease was so far advanced as to produce blood poisoning it had no effect upon the mind. They stated that the disease was common with men of the age of Mr. Schmidt, and that only in rare cases was the mind affected, and that in such cases death rapidly followed. The fact that Mr. Schmidt was old and infirm did not incapacitate him from making a will, unless his age and infirmities had so far impaired his mind that he was incapable of understanding the business in which he was engaged at the time that he executed the will, (*Yoe* v. *McCord,* 74 Ill. 33; *Waugh* v. *Moan,* 200 id. 298;) and the evidence falls far short of showing such condition to have existed in the testator at the time the will was executed in this case. The opinions expressed by the witnesses that Mr. Schmidt appeared to be forgetful and weakminded are entitled to but little weight in the face of the positive and uncontradicted testimony that during all the time these conditions were said to exist he was pursuing the same course of life and engaged in the same occupations which he had followed successfully for years. The evidence shows that subsequent to the marriage of his sons,—Gustav having married in 1891 and Fredrick W., later,—there was more or less bickering and trouble in the family, especially between the sons, and that Gustav and his wife had become somewhat alienated from the balance of the family; that by reason of this trouble Mr. Schmidt had at one time made up his mind to disinherit Gustav, and that after the will was executed, in which he was given one-fourth of the estate after his mother's death, Mr. Schmidt talked to his attorney of changing the will and cutting him off, and that at times he was worried and grieved over the trouble

between his sons, and that after the will was executed he made a statement in writing, which is in the record, giving his reasons for not dividing his property equally between his sons. The statements relied upon, however, to show his feeling upon the subject of the trouble between his sons, were mainly testified to by people who were not intimately acquainted with Mr. Schmidt, and who in several instances admitted they mentioned the subject to him, and not he to them. His more intimate friends and acquaintances say he said but little upon the subject, and a number of them never heard him mention the matter. That he had had trouble with Gustav, and that there was ill-feeling, however, is undisputed.

It cannot be claimed with any force, from the evidence appearing in this record, that the will was the result of an insane delusion, evidenced by the hatred of the testator of his son Gustav. In *Huggins* v. *Drury*, 192 Ill. 528, it was held that prejudice against a child is not ground for setting aside a will, unless the conduct of the testator can be explained upon no other ground than that of an insane delusion, and that acts of violence of a father toward his son, and statements derogatory to his character, do not show the existence of an insane delusion, where the acts or statements of the father are due to fits of temper which were provoked by the acts and conduct of the son. To the same effect is *Schneider* v. *Manning*, 121 Ill. 376, and *Nicewander* v. *Nicewander*, 151 id. 156. In the latter case it was said (p. 164): "Insane delusion consists in the belief of facts which no rational person would have believed. * * * Unreasonable prejudice against relatives is not ordinarily a ground for invalidating a will; but a will may be set aside where the testator's aversion is the result of an insane delusion and his conduct cannot be explained on any other ground." This case, however, was not tried upon that theory, but was tried upon the theory that Mr. Schmidt was an old man in his dotage, and that Fredrick W. Schmidt and his mother

took advantage of his condition to induce him to make the will which he did. It is clear that the will was not and could not have been made as the result of the undue influence of Fredrick W. and his mother over the testator, as the evidence is uncontradicted that neither of them was present when the will was executed or had anything to do with bringing about its execution. The parent has the right, if he deems proper, to divide his property unequally between his children, and the courts have never held that from the fact, alone, that a parent gave more by his will to his favorite child and less to one whom he believed unworthy that he was insane, or that the favorite child had fraudulently induced him to execute the will in his favor simply because he was kind to him and cared for him in his old age.

In *Francis* v. *Wilkinson*, 147 Ill. 370, it was said (p. 382): "The fraud or undue influence which will render a will or deed invalid must be connected with the execution of the instrument and operating when it is made; * * * and although a father may act under the advice of his son in his ordinary affairs and may be influenced by that advice, yet such relation and influence do not tend to prove the exercise of undue influence in the execution of a conveyance by the former to the latter. * * * The father may have been influenced by affection for the three sons and grandson, who remained with him and aided him in managing his farms, and for the widowed daughter, who staid at his home, and kept house for him, and managed his household affairs. 'But influence secured through affection is not wrongful, and, therefore, although a deed be made to a child at his solicitation and because of partiality induced by affection for him, it will not be undue influence' if it is not such as to deprive the grantor of his free agency. * * * Inequality in the distribution of property is not of itself conclusive evidence of undue influence, although it may be considered as a circumstance tending to establish undue

influence. The grantor or testator may give one child more than another without invalidating the conveyance or will."

It is the observation of all that the fact that a parent has the right to dispose of his property, by will, as he sees fit, in many instances is the only protection the parent has in old age, and is the only method left to him by which he can secure the care and attention which he is entitled to receive from his children. Mr. Schmidt was a German. The evidence shows that he did not reach a conclusion quickly, but when a conclusion was once arrived at he was not easily moved. From a careful study of this record we are firmly convinced that the testator, on February 7, 1899, had sufficient mental capacity to make a will, and that the will which he executed on that date was the result of his own deliberate judgment, and not the result of the undue influence of Fredrick W. or his mother, and that the jury reached the conclusion they did mainly from the fact that the will, in their judgment, was not fair to Gustav. Jurors are often inclined to disregard the evidence and hunt for some excuse outside of the evidence upon which to set aside a will if it does not comport with their ideas of right and justice, and it often becomes the duty of the courts, in this class of cases, to interfere and set aside their verdicts for that reason. (*Rutherford* v. *Morris*, 77 Ill. 397; *Freeman* v. *Easly*, 117 id. 317; *Nieman* v. *Schnitker*, 181 id. 400). When a court can clearly see that the jury had not been controlled by the evidence but have returned a verdict in utter disregard of the evidence, it should not be allowed to stand, but should be set aside and a new trial granted. *Bradley* v. *Palmer*, 193 Ill. 15.

In view of the fact that the decree must be reversed the cross-errors become unimportant and have not been considered. The motion to strike them from the record will, however, under the practice established in *Johnson* v. *Askey*, 190 Ill. 58, be denied. The expenses allowed

were taxed as costs, and the appeal brought up that part of the record.

The decree will be reversed and the cause remanded for a new trial.        *Reversed and remanded.*