Hurlbut, J.,
delivered the opinion of the court.
Action begun in Teller district court January 7, 1909. We .have read with painstaking care the entire abstract of record, seven hundred, pages. The record discloses a hotly contested controversy over the probating of a will, and we are not surprised to find the evidence decidedly conflicting upon the material issues. The law has imposed a duty upon the trial judge or jury of .determining all issues of facts. That duty was performed in this case by a lawful jury, which decided the issues in favor of the proponents of the will. The verdict of the jury and decree of the court were to the effect' that the paper or writing in controversy was the last will and testament of Prank J. Burnham, deceased.
It now becomes our duty to examine the record and ascertain therefrom whether or not any reversible error was committed by the trial court in the proceedings before it.
Appellants (contestors) in their petition allege that the writing was not the last will and testament of the testator; that at the time of its signing testator was in a dying condition, unconscious, irrational, and unable to know and understand the contents or purpbrt of the same; that he never became conscious or rational after the said writing was prepared and presented to him, and if he did sign such writing he did so by reason of persuasion, arguments, physical effort, and undue influence of other persons; that he was not at the time of sound mind and memory, and had not been of sound mind and memory for several years prior to that time.
*134 The answer of appellees (proponents) formed issue upon each of the above allegations. As to the truth of such allegations the verdict of the jury indicates they were not sustained. Some thirty witnesses testified, but no good purpose would be accomplished by separately commenting' on their testimony. There is sufficient evidence to support the verdict. A verdict for contestors could be equally sustained by the evidence.
Frank J. Burnham, the testator, left surviving him as sole heirs at law, a brother living in California and sister living in New Hampshire. The evidence tends to show that from early in 1902 up to. February 24, 1909, the testator had been living continuously with the Nevitt family at Florissant, Colorado, and during all that time had been treated by them as though he were a member thereof; that he was of an advanced age (68 years) and was seriously crippled by reason of an accident which had resulted in a broken leg; that for about nine'or ten months after he joined the family he used a cane in walking, and was incapacitated by reason of the accident from performing any physical labor of moment; that while living with the family he was ill a number of times, sometimes being confined to his bed; that during such illness his meals were provided for him and generally taken to his sick chamber by Mary Rebecca Nevitt, the devisee; that during all of the six years residence with the family he at all times was treated with kindness ■ and consideration by the various members thereof, was furnished by Mary Rebecca Nevitt and her husband with food, shelter and necessary clothing, and at times with modest amounts of money; that some time after joining the family testator volunteered to work for Mr. and Mrs. Nevitt (who were at that time conducting a hotel); that he cut and carried wood, carried water, went on errands, and performed other services of like nature in and about the hotel; that two or three months before testator’s *135 death the hotel occupied by the Nevitts was burned to the ground, after which they occupied other houses in Florissant, but he continued to make his home with them in their new abodes; that testator at all times spoke in kind and appreciative. terms of the Nevitts, particularly of Mary Rebecca Nevitt, often addressing her as “Aunt Nevitt,” or “Aunt Becky”; that during his entire residence with the family the utmost harmony and friendship existed between them and the testator; that testator at different times had stated to disinterested persons that the Nevitts’ domicile was his only home, and they would get what little he had in case anything happened to him; that the only moneys received by testator during his six years’ residence with the Nevitts was about $400, and' at his death he had in his possession about $75; that prior to the time he joined the Nevitts he received $2,000 from the sale of his ranch, but lost the same in ill-advised investments; that during his entire residence with them he received no moneys or support from either his brother or sister with the exception of a dollar or so sent him by his sister at Christmas time on several occasions; that before joining the Nevitts he was in the county hospital under treatment for the accident mentioned; that testator was of the impression that his brother did not care much about him, and was not much interested in what he did, or what his condition was; that his sister was not very much interested in his welfare; that the executor, Grant, at the request of testator, wrote the will and read the same to him before it was signed, and that shortly after testator signed the will May Horrigan had a conversation with him in which he gave her the names arid addresses of his brother and sister, and stated he did not want her to telegraph them at that time, as he thought he would be better in the morning. The evidence further tends to show that testator’s mental faculties were normal at the time, and for a considerable *136 period before the will was signed, and that he knew he was devising all his property to Mary Bebecca Nevitt, and thus disinheriting his brother and sister. We are unable to find anything in the record showing that Mr. Grant, Mary Bebecca Nevitt, or anyone else, used any undue influence to induce him to sign the will, or any physical or other force to compel him to do so. The evidence does not suggest moral turpitude on the part of Grant, or any of the Nevitts, by reason of anything done or said by them concerning the making and execution of the will. We do not overlook the fact that at and just prior to the time the will was signed by the testator, the five persons around his bedside were all relatives of the devisee, Mary Bebecca Nevitt. It is reasonable to presume this fact was impressed upon the minds of the jury in argument. They were authorized to, and probably did, scrutinize with caution the testimony of such relatives bearing upon the circumstances surrounding the execution of the will. Under such circumstances the law does not impute to relatives or interested witnesses less honor or integrity than that possessed by other classes of witnesses. Experience, however, has taught that such witnesses áre more prone to be influenced by their personal interests or kindred ties, in giving testimony, than would be'the case if they were entirely disinterested or indifferent witnesses. Courts generally direct an attentive ear, and give vigilant attention, to testimony of such witnesses, and are quick to detect fraud or undue influence if suggested by evidence adduced at a judicial inquiry into Executions of wills. If impressed that bad faith is shown, they will promptly interpose and prevent the threatened wrong. There is no more shocking fraud known in human affairs than that effectuated by inducing one to convey or will away his property against his will or consent, while under the influence of artifice, un *137 lawful persuasion, or duress practiced upon him by those «who profit thereby.
Counsel suggests that it was the duty of the testator to will his property to the brother or sister, instead of to a.stranger. "We cannot assent to this. There may exist in man a natural inclination to will his property to relatives rather than to strangers, but this inclination is frequently removed by circumstances surrounding the testator. It is common knowledge that the blood tie between brother and sister is not as binding as that between parent and child, or the tie between husband and wife. Even then a parent may lawfully disinherit his own child if he chooses, and a husband or wife may disinherit the other to the extent of one-half of all his or her estate. It is not an unreasonable presumption in the light of this record, that the testatop in executing this will may have been influenced by gratitude and appreciation in devising his property to appellee, Mary Rebecca Nevitt.
Ninety-nine assignments of error appear in the record. Appellants’ counsel contends that the trial court committed reversible error in permitting-Melvin, Daniel, Guy and Minnie Nevitt (Mrs. Grant) to testify at the trial on behalf of proponents, on the ground that they were interested witnesses under the statute. We think they were competent to testify under Sec. 4816, Mills’ Annotated Statutes. — Butler v. Phillips, 38 Colo., 378, 88 Pac., 480, 12 Ann. Cas., 204; White, Admr., v. Christopherson, 46 Colo., 46, 102 Pac., 747; In re Hatfield’s Will, 21 Colo. App., 443, 122 Pac., 63. In the latter case it was held that the wife of the legatee was a competent witness.
Appellants also complain of the action of the trial court in refusing, on its own motion, to allow the witness Kessel to answer the question-propounded on cross-examination, viz.: “Do you think that indicates a bright *138 man or a man of sound mind and memory?” If there was any error in this action of the court it was harmless, for the reason that the witness was exhaustively inter-' rogated both on direct and cross-examination concerning his impressions of the mental condition of deceased. Without further discussion of the rulings of the court in rejecting or admitting testimony, raised by many other assignments of errors, we are satisfied that no reversible error was committed, and that no substantial rights of appellants were invaded by such rulings. In many instances the facts sought to be elicited by the excluded interrogatory were brought out by other testimony admitted, while again facts disclosed by evidence admitted over objections of appellants were shown by other admitted evidence where no objection was interposed.
Error is also -claimed by the admission in evidence of certain letters written by the testator to Guy P. Nevitt, his attorney, which letters were written between July 9, 1906, and testator’s death. The letters were competent evidence under the issues that testator had not been of sound mind and memory for several years prior to the time he signed the will, and that for several years prior thereto his mind and memory were so weak and unsound that he was not fit or competent to fairly, safely or properly care for or preserve his property or transact business. The jury were entitled to consider the contents of these letters concerning such issues for what they were worth as proving or disproving a weak and unsound mind, or the testator’s incompeteney to transact business, etc. — In re Shapter’s Estate, 35 Colo., 578, 85 Pac., 688, 6 L. R. A. (N. S.), 575, 117 Am. St., 216.
Under the 35th assignment of error appellants vigorously assert the invalidity of the will, on the ground that it was not attested in accordance with the statute, Sec. 4653, Mills’ Annotated Statutes, and Sec. 4664, Revised Supplement. If witnesses, when signing a will, *139 are in such a place that the testator can see them, if he chooses, they are in his presence, within the meaning of the statute. — Ombre v. Weishaar, 74 Ill., 109. The evidence shows that the testator suggested that Melvin Nevitt and May Horrigan he witnesses to his will, and also shows that when the will was attested hy the two witnesses they were in his presence, and that he was in a position to see them and what they were doing.
In the 62nd and 63rd assignments of error appellants claim that it was error in the court to exclude from evidence Exhibits 19 and 20, being letters purporting to have been written by F. B. Burnham, one of the contestors, to J. B. Severy. Objection was made on the grounds that the same were not sufficiently identified, were written by one of the parties to the suit, etc. We think the objections well taken. The witness Bobinson did not purport to testify that he knew the signature or handwriting of the author of the letters, or that they were written or signed by such author. As we read the record, proper identification was wanting. On the second ground they were inadmissible as self-serving statements made by one of the parties to the suit, such party being specifically disqualified by the statute. — Mills’ Annotated Statutes, • Sec. 4816; Butler v. Phillips, supra; In re Shapter’s Estate, supra.
We have carefully examined the record as to the rulings of the trial court in excluding from evidence the hypothetical questions propounded to the physicians. All such questions but one included substantially this language: “If one suffering from pneumonia lay in bed on his back from, noon or 1:30 p. m. with his eyes and mouth open, his face purple, his pulse about 145, gasping for breath, paying, no attention to anything or any per.son, except to answer a question when asked, and that condition continues until between 5:30 and 6:00 o’clock, what would you say, ’ ’ etc. There is no evidence to show *140 such a state of facts. The only testimony which" could be considered as tending to show such to be the condition of testator was that of May Iíorrigan and Mr. Allen. But under the most liberal analysis of their testimony it falls far short of showing such facts. Neither of them pretends that he or she was in the presence of the testator all the time from 12 or 1:30 o’clock until 5:30 or 6 o’clock of that day. Their testimony shows they were present only a short portion of that period. The law seems to be settled that the hypothesis stated must be founded on evidence which either proves or disproves, or tends to prove or disprove the same, and that if the assumed facts are not supported by some evidence tending to establish them the question is improper and should not be propounded. — Gottlieb v. Hartman, 3 Colo., 53; Jackson v. Burnham, 20 Colo., 532, 39 Pac., 577.
Appellants requested seventeen instructions to be given to the jury, all of which were refused, and error is predicated thereon. Of the instructions so refused, 1, 2, 4, 10 and 16 are abstract statements of law upon the question of insanity and insane delusions, and in s.o far as they purport to guide the jury in deciding the mental capacity of the testator they are not so helpful as given instructions numbered 5, 6, 9 and 10. The instructions so given pertain to the same subject-matter as those refused, and by their phraseology more clearly interpret the law with reference to the facts disclosed by the evidence. The instructions so given appear to have been carefully considered, and are supported by reputable authority.*
Redfield on Wills, vol. 1, p. 121, paragraph 11; Trish et al. v. Newell et al., 62 Ill., 196, 14 Am. R., 79; Schneider *141 v. Manning, 121 Ill., 376, 12 N. E., 267; Huggins v. Drury, 192 Ill., 528, 61 N. E., 652. We see no serious objection to refused.instruction number 6, wbicb. told tbe jury that, in determining tbe mental condition of tbe testator at tbe time be made tbe will, tbey could consider tbe evidence as to bis condition both before and after that time as tending to establish a probability that bis mind was unsound at the time tbe will was executed.' However, it appears to us that refusing tbe instruction, if error at all, was harmless. Tbe court permitted a wide latitude in showing testator’s acts and mental condition, both before and after tbe will was made. Tbe jury were instructed that they should consider all tbe evidence in arriving at their verdict. Under those circumstances we do not think tbe failure to specially instruct tbe jury that they could consider evidence of all facts existing both before and after tbe time tbe will was *142 made was prejudicial to contestors. Refused instruction number 8, telling the jury they might give more weight to expert testimony than to that of non-professional witnesses, was rightfully rejected. An imposing array of authority lays down the rule that expert testimony is to be considered the same as any other, and that the jurors’ attention should not be called specifically to such testimony, either in the way of discrediting it or giving it undue prominence. — Brickwood’s .Sackett on Instructions, Vol. 1, Sec. 126; Rivard v. Rivard, 109 Mich., 98, 66 N. W., 681, 63 Am. St., 566; Blough et al. v. Parry et al., 144 Ind., 463, 40 N. E., 70, 43 N. E., 560. Refused instruction number 14 instructs the jury, among other things,, that if the testator did not request both witnesses to sign the will their verdict should be for contestors. This is not the law. The”statute, Sec. 4653, Mills’ Anno *143 tated Statutes, only requires that the will be ‘ ‘ attested in the presence of the testator or testatrix, by two or more credible witnesses.” There is no requirement that such witnesses shall attest the same upon request of the testator. — Bood on Wills, Sec. 289. We have given careful consideration to the other instructions refused by the court, and are satisfied that no prejudicial error was committed in refusing’ them.. Some of them might have been properly given, while others were subject to criticism as not fully and clearly stating the law as applicable to the facts disclosed by the evidence. On the whole, their subject-matter was included within the language of the instructions given.
Twelve instructions were given by the court, and appellants assign error upon all thereof except the first three. Those numbered 5, 7, 9 and 11, however, are not *144 seriously urged as error. Instructions numbered 4 and 6; as to the facts concerning the attestation of the will, and mental condition of the testator at that time, respectively, are supported by authorities hereinbefore cited, as well as the following, viz.: Freeman v. Easly, 117 Ill., 317, 7 N. E., 656; Blackman v. Edsall, 17 Colo. App., 429, 68 Pac., 790; Cyc., Vol. 40, p. 1007. Instruction number 8, concerning undue influence, is an unobjectionable statement of the law on the subject. — England et al. v. Fawbush, 204 Ill., 384, 68 N. E., 526; Webber v. Sullivan et al., 58 Ia., 260, 12 N. W., 319. We read nothing in Blackman v. Edsall, supra, which is opposed to the principle declared in the instruction. No authority is produced by appellants to sustain their objection to instruction number 10, upon the question of insane delusion. On the contrary, it is well supported *145 by Petefish v. Becker, 176 Ill., 448, 52 N. E., 71. We repeat that we are satisfied from a careful consideration of all the evidence that- the instructions given by the court, when taken as a whole, impartially and fairly state the law upon the various phases of the case, and as to' instructions refused, when considered in the light of all the evidence adduced, no substantial rights of contestors were prejudiced by refusing same. The following excerpts are applicable:
“The refusal of instructions, which, though containing correct propositions, could not, in view of all the facts developed by the evidence have prejudiced the party complaining, will not operate to reverse the case.” — Sec. 190, Yol. 1, Brickwood’s Sackett on Instructions.
“Upon looking at the instructions given, we find them to be consistent with each other. They must, there *146 fore, be considered together; and if, as a whole, they fully and fairly submitted the questions involved to the jury, we do not see that the defendant has any ground of complaint.” — Hindry v. McPhee, 11 Colo. App., 398, 53 Pac., 389.
To the same effect, Davis et al. v. Shepherd, 31 Colo., 141, 72 Pac., 57.
Appellants next complain that the court erred in not receiving oral testimony at the time the motion for new trial was under consideration. There was no error in such ruling. The supreme court in Schoolfield v. Brunton, 20 Colo., 139, 36 Pac., 1103, has settled the question by holding that the matter of receiving oral testimony in addition to the affidavits required by Sec. 217, Mills ’ Annotated Code, is within the discretion of the trial court. The record does not suggest an abuse of this discretion.
*147 Appellants further insist that the trial court erred in not granting a new trial based upon the alleged drunkenness of one of the jurors. This charge was supported, as well as controverted, by many affidavits. The court found that “the grounds respecting the drunkenness of the juror Keegan were not well founded.” This issue, like all others contained in the motion for new trial, was to be„ decided by the court in the exercise of sound judicial discretion. Jones v. The People, 6 Colo., 452, 45 Am. R., 526; May v. The People, 8 Colo., 210, 6 Pac., 816, and Repath et al. v. Walker et al., 13 Colo., 109, 21 Pac., 917, are in point and seem to be ample authority for the court’s ruling on this question.
Under assignment .©f error number 99, appellants challenge the form an^F'Validity of the decree, but cite no authority to sustain their reasoning. We are unable *148 to discover any material error in the form of the decree. Its substantial recitals are supported by evidence and the verdict of the jury.
The record here shows, on the one hand, that the testator, at the time he made the will, had a brother and sister living in this country; that his sister possessed an abundance of love and affection for the testator, and the brother a kind and considerate feeling’ towards him; that some-years before his death they donated to the testator their interest in a certain ranch which he afterwards sold for some $2,000; hence, whatever feeling of hostility, if any, which the testator might have entertained against them, was unfounded. On the other hand, the evidence discloses a man of advanced age, seriously crippled and disabled from a broken leg, enflifejig into the family circle of the Nevitts at Florissant; that for many months after joining them he was not able to do any physical work of moment, and during such time was penniless, without home or habitation other than that provided by his benefactors; that a portion of such time he was ill, but received from them shelter, food and kind attention, particularly from the legatee, Mary Rebecca Nevitt; that for about six years he remained with them, and after they *149 had lost their entire household possessions by a destructive fire they still maintained this old man within the family circle, giving him such care, support and attention as their financial condition would warrant. Many disinterested witnesses testified to the kind and appreciative declarations of the testator regarding his benefactors, in which he' repeatedly asserted that the only home he had was with the Nevitts; that they were his true friends, etc. They also testified as to the harmonious and friendly relations existing between testator and the Nevitts during all those years. Under these circumstances it does not appear strange or unnatural that the testator might have decided in his closing hours to will his estate to his benefactor, Mary Eebecca Nevitt. There was no legal, and possibly no moral, duty, under this situation, requiring him to will his property to his brother or sister.
Decided May 12, A. D. 1913.
Rehearing denied June 10, A. D. 1913.
We have endeavored to give this case most careful consideration, and have examined every assignment of error, but have noticed only, in this opinion, those we deem the most important. Upon a full consideration of the entire record we cannot say there has not been a fair and impartial trial. Neither do we discover anything in the record which justifies an inference that the trial judge was governed by improper motives, or displayed, at •the trial, any bias or prejudice, for or against, any of the parties or attorneys, or that the jury did not act honestly and impartially in rendering'their verdict. The judgment is affirmed.

The instructions given below are as follows:
3. It is provided by statute that every person, aged .twenty-one years, if a male, or eighteen years, if a female, being of sound mind and memory, shall have the power to devise all the estate, right, title *141 and interest in possession, reversion or remainder, which he or she hath, or at the time of his or her death shall have, of, in and to any lands, ’ tenements, hereditaments, annuities or rents charged upon or issuing out of them,'or goods, chattels and personal estate of every description whatever, hy will or testament.
A will, to he valid, must he in writing and signed by the testator, or. hy some one in his presence and hy his direction, and attested in the presence of'the testator hy two or more credible witnesses. An attesting witness is one who subscribes his name to a will as a witness to its execution, at the request of the testator.
4. If Frank J. Burnham signed the instrument in question in the presence of Melvin L. Nevitt and May Horrigan, who were in the same room with the said Frank' J. Burnham and only a few feet from him, with the view between the-said Frank J. Burnham and’the-said Melvin L. Nevitt and May Horrigan uninterrupted, and the said witnesses at the time within the range of the vision of the said Frank J. Burnham;- and if the said Frank J; Burnham, taking into account his then condition- or state of health, and his then position, as shown by the evidence, either saw, or could have seen, if he had wished -to, and had looked in the proper direction, the said witnesses; and' enough of the act then being done by them, to know on .his- part' from what he *142 so saw, or might have seen if he had wished, and from what he knew of the then surrounding' circumstances, that the said Melvin L. -Nevitt and May Horrigan were then signing their names as witnesses to the said instrument in writing, as the will of the said Prank J. Burnham, then upon that question you should find the alleged will in question to lie properly attested.
5. It is only requisite that the said Prank J. Burnham at the time of making his will should be of such sound mind and memory as to enable him to know and understand the business in which he is engaged. It is not necessary that he should be in the full possession of his reasoning faculties. It is only necessary that the testator should have mental capacity sufficient for the transaction of the ordinary affairs of life, and possessing these, though he may have been feeble in mind and body from sickness or old age, he had the legal right to dispose of his property Just as he pleased, without consulting either his family or acquaintances. If at the time he signed the paper in dispute, he had mind and memory sufficient to transact his ordinary business, and when he made the will he knew and understood the business he was engaged in, then you should find the said paper writing to be his will.
6. A person, in order to make a valid will, should be of sound • mind and disposing mind and memory. What is meant by soundness *143 in this respect is not that the mind should he in its full vigor and power, hut that its faculties, its machinery, should he in working 'order, so to speak, with an active power to collect and retain the elements of the business to he performed for a sufficient time to perceive their "obvious relations to each other. The term “sound mind,” “does not mean that the testator shall have the same command of his mental faculties that he may have when in health. Wills are often made when the bodily powers are broken and the mental faculties are enfeebled,' and it is only required that the testator shall retain so much of his mental power as will enable him to understand his relations to those who would he the natural objects of his bounty and the property he wishes to distribute and the manner in which he intends to distribute it. A person of sound mind and memory is one who has full knowledge of the act he is engaged in, and of the property he possesses, an intelligent understanding of the disposition he desires to make of it, and of the person or persons he desires to receive his property and the capacity to recollect and apprehend the nature of the claims of those who are excluded from participating in his bounty. It is not necessary that he should have sufficient capacity to make contracts, to do ■ business generally, or to engage in complex and intricate business matters; and if the said Frank J. Burnham, at the time he signed the paper writing in question, did not have such kngwledge, as above defined in this instruction; and did not possess *144 such understanding as to the disposition he desired to make of his property, and of the person he desired to receive the same, and did not have capacity to recollect and apprehend the nature of the claims of those who were excluded from participation in his bounty, then he would not be of sound mind and memory within the meaning o‘f 'the law; but if, on the other hand, at the time the said Frank J. Burnham signed the paper writing in question, he had such knowledge as above defined in this instruction, and possessed such understanding • of the disposition he wished to make of his property, and of the person he desired to receive the same, and had capacity to recollect and apprehend the nature of the claims of those who were excluded from participating in his bounty, then he would be of sound mind and memory within the meaning of the law, even if you may believe from the evidence that he was physically weak and did not have mental capacity sufficient to make contracts, to do business generally, or to engage in complex and intricate business matters.
7. A will proved or admitted to have been executed and attested, as prescribed by law, will be presumed to have been made by a person of sound mind; but if testimony is shown which counterbalances that presumption, the party seeking to support such will must establish by affirmative evidence-to the satisfaction of the jury that the testator was of sound mind when the will was executed.
Ordinarily, where a will is in proper form, signed by the testator, *145 and attested by attesting witnesses, the presumptions are in favor of testamentary capacity, due execution, and that the will contains the unrestrained wishes of the testator; and the burden abides with the party attacking the will to show improper execution, lack of testamentary capacity, or undue influence.
8. Where undue influence is relied upon to set aside a will, the question to be decided is, did the testator make and execute the alleged will in all its provisions of his own free will and volition, so that it now expresses his own wishes and intentions, or was the testator constrained or induced through the undue influence, restraint, coercion or improper conduct of others, to act contrary to- his own desire and intentions regarding the disposition of his property, or any part of it? In order that one contesting a will may prevail, it is necessary to show by the evidence that undue influence was in fact exerted over the party making the will, and that it was successful in subverting and controlling the will of the party making the will. Both of these facts must be proven by the contestants by the weight of the evidence in order to defeat the will.
9. If said Frank J. Burnham, on the day he made the alleged will, was suffering on account of disease, or that his mental faculties were obscured by the disease from which he was suffering, still this would not necessarily prevent his having sufficient capacity to make a *146 will. Tlie obscuration of tbe mental faculties by disease must have so beclouded the mind that the testator does not understand the nature of the business in which he is engaged, or does not understand at the time of making the instrument, substantially the act, the extent of his property, his relations to others who might or ought to be the objects of his bounty, and-the scope and bearing of the provisions of the will, and does not possess the other qualifications which are mentioned in these instructions.
10. An insane delusion is á fixed and settled belief in facts not existing, which ho rational person would believe. Such delusions may sometimes exist as to one or more subjects. To sustain the claim of the contestants that Frank J. Burnham was laboring under the insane delusion in regard to the relation and temper of his brother and sister toward himself, it is not sufficient to show that he had a suspicion to that effect, or that his suspicion was not well founded. Although he may have had groundless and unjust distrust with reference to the feeling of his brother and sister towards himself, yet such doubt does not establish a condition of lunacy, or the lack of testamentary capacity, unless it appears from a preponderance of the evidence that such distrust caused him to execute a will he would not otherwise have made. The right of the testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he, will with his own, and if there *147 is no defect of testamentary capacity, Ms will should he sustained, though its provisions are unreasonable or unjust.
11. You are the judges of the credibility of the several witnesses who have appeared before you, and of the weight or importance to he given to their respective statements or evidence. In passing upon these matters you may take into consideration the interest, if any, the witnesses may have in the result of this trial, their conduct upon the .witness stand, their intelligence or want of intelligence, their candor or want of candor, their means of knowledge of the facts to which ■they have testified, any bias that they may have shown in their evidence, and from all the facts and circumstances occurring at the trial, determine which witnesses are the more worthy of credit and give credit accordingly, and give the evidence of each witness such weight as you shall deem it justly entitled to. If any witness has wilfully and corruptly testified falsely concerning any material matter in this case, you are at. liberty to disregard the whole or any portion of the evidence of such witness, except in so far as such evidence is corroborated by other credible evidence.
12. As to any argument, statement or objection made to the court, or to the other counsel by counsel of either party, or any remark, decision or' order made by the court, and not made to the jury for their consideration in the matter during the progress of this trial, it is not a matter for your consideration in this ease, and should not *148 in any way enter into your deliberation, consideration and determination of this case; that neither by these instructions, nor by any words uttered, or remark made by the court during this trial does or did the court intimate, or mean to give, or wish to be understood as giving an opinion as to what the proof is or what it is not, or what the facts are in this case, or what are not the facts therein. It is solely and exclusively for the jury to consider, weigh and determine the facts, and this you must do from the evidence, and, having done so, then apply to such facts the law as stated in these instructions. The instructions given to the jury are and constitute a connected body and series, and should be so regarded and treated by the jury; that is to say, you should apply them to the facts as a whole, and not detached or separated, any one instruction from any or either of-the others, as no one of these instructions contains all the law governing this case.